UNITED STATES, Appellee

v

RONDAL L. SESSIONS, Technical Sergeant, and IRVIN J. BROWN, Staff Sergeant, U. S. Air Force, Appellants

10 USCMA 383, 27 CMR 457

384

No. 12,551

Decided May 1, 1959

*Captain Norman J. Nelson* argued the cause for Appellants, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Major Lawrence J. Gross* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Robert W. Michels.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Upon their joint trial by general court-martial, the accused were convicted of two specifications alleging forgery of checks, in violation of Article 123, Uniform Code of Military Justice, 10 USC § 923, and were sentenced to a dishonorable discharge, partial forfeiture for two months, confinement at hard labor for eighteen months, and reduction to the lowest enlisted grade. Following approval by the convening authority, this sentence was affirmed by the board of review. Acting pursuant to authority granted by Article 74(a) of the Code, supra, 10 USC § 874, The Judge Advocate General of the Air Force has suspended execution of the punitive discharge of each accused until release from confinement.

The facts upon which the convictions rest, and those upon which our decision turns, are clear.

Master Sergeant Lee R. Walden maintained a checking account at the Yokota Branch, Chase Manhattan Bank. When he received his statement from that facility covering his June 1957 transactions, he discovered two checks which he had not drawn had been charged against his account. Each was dated "June 1, 1957," was payable to "Harlam H. Kennedy," in the sum of $50.00, and bore the signature of "Lee R. Waldren" as maker. These checks were endorsed "Harlam

H. Kennedy" and were cashed at the Johnson Air Base Facility of the Chase Manhattan Bank by a cashier who was unable to identify the individual presenting them.

The checks were examined by a handwriting expert assigned to the Military Police Laboratory, Camp Fuchinobe. Infrared photography disclosed that a serial number customarily affixed by the Bank as a means of identifying an account had been obliterated from each check prior to presentation. The Bank's records disclosed the checks were issued to the accused, Brown, on June 1, 1956. He became a suspect and thereafter voluntarily supplied samples of his handwriting and printing. Exemplars of the accused, Sessions, were also obtained. Upon analysis, the handwriting expert concluded each had written or printed portions of the checks in question.

A few days after Sessions submitted his exemplars, Special Agents Hanson and Gaines, Office of Special Investigations, proceeded to the quarters occupied by Sessions and his wife on the base, to conduct a search of the premises. When the prosecution sought to elicit the testimony of Hanson relative to the results of this search, counsel for the accused interposed an objection for no evidence of authorization for the search was before the court-martial. Thereupon, Hanson testified he had the verbal permission of the **385**

Base Commander. His complete testimony on this subject is as follows:

"Q Mr. Hanson, you stated that you searched the quarters of Sergeant Brown in the barracks and that you searched Sergeant Sessions' residence; is that correct?

"A That is correct, sir.

"Q I see. What, if anything— Strike that, please. Did you have authority for this search?

"A Yes, sir; I did.

"Q Would you explain this, please, to the court in your own words.

"A This authority came verbally. Just prior to the search it was followed by written authority from the Base Commander of Yokota Air Base signed the following day.

• • • • •

"Q Now, you have stated that you received verbal permission to conduct the search; is that correct?

"A That is correct.

"Q And whom did you talk to?

"A Whom did I talk to?

"Q Yes.

"A On the search?

"Q To get the authorization for the search.

"A Mr. Heller, detachment commander.

"Q You talked to Mr. Heller?

"A Mr. Heller personally called.

"Q Now, just a moment, please. I just asked you who you contacted. Did you personally talk to the Base Commander prior to making the search?

"A No, sir; I did not.

"DC: I object to what has been marked as Prosecution Exhibit 8 for identification.

"LO: Do you have any further argument?

"TC: I have no discussion on this point. No, sir.

EXAMINATION BY THE COURT

"Questions by the Law Officer:

"Q Mr. Hanson, you say that there was a written authorization for the search?

"A Yes, sir.

"Q Subsequently?

"A Yes, I had the authority. I have the authority with me now.

"Q When was that executed?

"A The following day.

"Q Who signed it?

"A Colonel Johnston, Base Commander.

"Q He is the Base Commander?

"A Yes, sir; at that time he was.

"LO: The objection is overruled."

The exhibit (Prosecution Exhibit 8) thus received contained words and letters in a handwriting identified by the expert as that of the accused. It was in this form:

"I have I ha a Walden den
Walden Walden Walden
Walden Walden den
Walden."

Each accused was a witness in his own behalf. Sessions denied any particpation in the forgery. Adverting to Prosecution Exhibit 8, he explained that after he had supplied specimens of his handwriting, he and his wife jotted down some of the words he had been requested to write by the investigators. They then compared their handwriting to determine whether they could detect any similarities. Because so little of the sheet he had used was marked, he saved it for the children to use as scrap paper. This was observed when the premises were searched and was discarded immediately thereafter by his wife in an effort to clean up "the confusion of paper" produced by the search. Sometime thereafter the agents returned and took the exhibit.

A more complete description of the circumstances of this discovery is found in the testimony of Agent Hanson as stipulated by the parties. He was informed of the paper by Gaines after the search was completed. So he returned to Sessions' quarters, was admitted, and was given the paper by the accused after the agent had informed him of the object of his return.

The accused, Brown, also denied complicity. He acknowledged that in June 1956 he had opened a checking account in the bank and had received a book of checks bearing the number

appearing on the forged instruments. However, he averred that shortly thereafter he had closed the account and had discarded the unused checks.

The importance of the challenged evidence to the prosecution's case against Sessions cannot be overemphasized, for it was relied upon by the prosecution as the sole support of the handwriting expert's testimony. The latter testimony need not be reviewed in detail, since sufficiency of the evidence is not the subject of this appeal. However, it must be observed that standing alone it was far from convincing and could not possibly be described as compelling.

Whenever an accused challenges the receipt of evidence obtained upon a search, the prosecution must affirmatively establish the justification for the search to the satisfaction of the law officer. United States v Berry, 6 USCMA 609, 20 CMR 325; United States v Weaver, 9 USCMA 13, 25 CMR 275. The latter passes on this question as an interlocutory matter (Article 51(b) of the Code, supra, 10 USC § 851) and his ruling is reviewable only for abuse of discretion. But this discretion is to be exercised in the light of the evidence before him at the time he makes his ruling. United States v Richard, 7 USCMA 46, 21 CMR 172.

The instant record reflects no tenable basis for a claim of the right to search other than that urged by Agent Hanson at the trial, namely, a specific authorization by the Base Commander. A contention by the Government to the effect that the accused consented to the second search in which the exhibit was seized is immediately rejected. There was no such contention made at the trial and nothing reflected by this record even remotely suggests such a possibility—the second search was well under way before the object thereof—Prosecution Exhibit 8—was mentioned.

Hanson's testimony on the question was initiated by the positive declaration that the search was verbally authorized. He took pains to omit, it seems to us, the source of this verbal authorization, and certainly he was careful to stress the existence of a written authorization issued subsequent to the search by the Base Commander. When pressed in cross-examination to disclose the source of his authority, he parried with equivocation, and finally acknowledged that he had spoken only to his Detachment Commander. Although he stated the latter had "personally called," he failed to identify the person called or even the subject of the call. Throughout his brief testimony on the subject, he never once positively identified the source of the authority relied upon, but very obviously sought to leave the inference the Base Commander had authorized the search. This falls far short of the standard of evidence the Government must produce to sustain its burden of establishing justification of a search.

If we were to credit the testimony with justifying, even slightly, the inference the agent sought to suggest, that slender reed would not support the Government's position. It is fundamental learning that statements of others not under oath, and not in court subject to cross-examination, are inadmissible when offered to prove the truth thereof. United States v Mounts, 1 USCMA 114, 2 CMR 20; paragraph 139a, Manual for Courts-Martial, United States, 1951. In this case, the witness could testify that Major Heller had authorized the search only if such authority was vested in Major Heller, for only the fact of that statement, not its truthfulness, is material. However, he cannot testify that Major Heller had told him the Base Commander had told Major Heller the search was authorized. This is hearsay of the rankest sort, yet it is the most that can be inferred from the testimony before us.

The Government argues that Han-

son's reference to the "written authorization for the search" is sufficient to establish justification to the required degree. In this connection, we are told the allied papers contain a photostatic copy of the authorization relied on now as confirmatory of the verbal permission granted earlier. The trouble with this argument is that it overlooks the basic requirement that evidence, to be considered by a court-martial and by appellate tribunals, must be in the record, not retained in the pocket of the witness. United States v Scales, 10 USCMA 326, 27 CMR 400.

We conclude, therefore, that the law officer's ruling in receiving the challenged evidence lacked any foundation in the record. It constituted an abuse of discretion and was erroneous. This conclusion brings us to a consideration of the final point of the case—the possibility of prejudice to each of the accused.

This is not, as the Government argues, a case in which the evidence, apart from the challenged exhibit, compellingly establishes guilt. Indeed, the only other evidence linking Sessions to the crime was that supplied by the handwriting expert. His testimony was seriously attacked upon cross-examination, and the basis for the conclusion he expressed was all but destroyed by the defense counsel. Under these circumstances, only invocation of a theory of waiver arising out of the accused's testimony in open court can sustain the conviction.

As to this, our decision in United States v Haimson, 5 USCMA 208, 223, 17 CMR 208, is controlling. There, in its attempt to rebut evidence of the accused's good character, the Government was permitted to introduce evidence of specific acts of misconduct allegedly committed by him. When this was questioned on appeal, it was contended that the accused had waived any error by returning to the witness stand in an effort to refute the extraneous allegations. Speaking

through Judge Brosman, the Court declared:

". . . There is doubtless authority for the position that the defense objection afforded an adequate protection to Captain Haimson, and that—when affirmative evidence bearing on the same incidents was offered thereafter—he waived the right to object in this Court. However, we are unwilling to hold the defense to an 'all or nothing' reliance on the soundness of its objection in the persent sort of situation, and cannot agree that the accused should be compelled to entrust the correction of the error to the sometimes untender mercies of reviewing authorities—with, at best, the concomitant necessity to undergo a rehearing. We are sure that in electing the course he chose, the accused did not intend thereby 'to fight this issue out at the trial level'—as the Government contends —and to forfeit the right to have the law officer's admissibility ruling reviewed on appeal."

The same principle applies to the case at bar. Evidence obtained as the result of a challenged search, unjustified by any showing made at the trial level, put the accused in the position of "explaining" that which should never have been before the court-martial. The necessary effect of this was to divert the court's thinking processes to the point where it was willing to conclude that where there is so much smoke, there must be fire. Sound judgments are not based upon such foundations. Convictions so predicated cannot stand.

The prejudice to the accused, Sessions, having been shown, we turn to a consideration of the effect of this error upon the co-accused, Brown. At the threshhold of this consideration, we are met by a Government contention that the case of United States v Bass, 8 USCMA 299, 24 CMR 109, shows with definitiveness that Brown has no standing to complain inasmuch as he had no proprietary interest in the premises searched. If our problem turned solely on whether Brown

388

could suppress the illegally seized exhibit, an unbroken chain of precedent would support the Government's position. Holt v United States, 42 F 2d 103 (CA 6th Cir)(1930). In re Nassetta, 125 F 2d 924 (CA 2d Cir)(1942); Grainger v United States, 158 F 2d 236 (CA 4th Cir)(1946); Gaskins v United States, 218 F 2d 47 (CA DC Cir)(1954); Lovette v United States, 230 F 2d 263 (CA 5th Cir)(1956). But we are not at all concerned with that problem here. Having determined that the questioned evidence was improperly received, our inquiry is simply whether that error adversely affected the substantial rights of either or both of the accused. As we have seen, Sessions was prejudiced. We further conclude that the effect upon Brown was equally noxious.

The specifications allege joint offenses; the proceedings resulting in their conviction was a ▆▆▆▆ ▆ joint trial; in addition to the handwriting testimony, the Government relied upon but a single item of corroborating evidence: As to Sessions, Exhibit 8; as to Brown, the identification number upon the reverse side of the checks. In the main, therefore, these accused were intimately linked in the substance and the form of the Government's presentation. The position of each accused at trial served to join them together in a strong common bond. Each unequivocally denied his guilt, and each declared he knew the other only slightly and solely in connection with the performance of military duties. In these circumstances, permitting hearsay evidence which tends strongly to destroy the veracity of Sessions—were his explanation thereof rejected—would have the necessary effect of destroying Brown's claim that his association with Sessions was on an altogether official basis.

When two accused are so intimately linked at trial, and when the evidence is in such delicate balance, it is impossible to say with any degree of certainty that the prejudicial effect of improperly received evidence was limited to a single accused. Cucchia v United States, 17 F2d 86 (CA5th Cir)(1927); United States v Kidd, 153 F Supp 605, 610 (WD La)(1957).

The decision of the board of review, as to each accused, is reversed. A rehearing may be ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

To frame the issue in this case properly requires a more detailed statement of facts than I find in the Court's opinion. For that reason, I will develop more fully the evidence shown by this record. As indicated in the base opinion, the victim's bank account was charged with two checks in the sum of $50.00 each, which had not been signed by him. Upon discovery of the debit, he turned the cancelled checks over to an agent of the Office of Special Investigations. At the same time, he furnished handwriting exemplars to be used to compare with the signatures on the checks. The laboratory examinations cleared the victim of suspicion, and the search turned elsewhere. During the investigation, some eight individuals, including the two accused, became suspects and were interrogated in connection with the offense. Each was properly advised of his rights under Article 31, and each voluntarily submitted samples of his handwriting. The first exemplars were obtained on July 29, 1957. These were forwarded to the Military Police Laboratory and Repository, where they were used to compare with the signatures on the checks. After the forged documents were enlarged, a previously obliterated bank number became visible, and it was ascertained that the book of blank checks identified by that number had been issued to the accused, Brown. At this time, certain of the suspects were eliminated, but other exemplars were needed to complete the laboratory processes. On August 5, 1957, the two accused and two other individuals still suspected were taken to the Military Police Laboratory where, after having again

**389**

been advised of their rights, they furnished additional exemplars. In each and every instance, the handwriting samples were voluntarily and willingly given, and the conclusion of the handwriting expert was based entirely upon the exemplars furnished. The questioned document subsequently obtained at the home of Sergeant Sessions was not used by the expert in forming his opinion as to who had actually signed the checks.

On August 12, 1957, a search of Sergeant Sessions' quarters was made by two special agents of the Office of Special Investigations and the first sergeant of accused's unit. For reasons which will hereinafter appear, I contend that prior to taking that step the agents obtained authorization from the commanding officer to search the premises and seize any incriminating property, but for the moment I will pass that question. On this search, nothing of importance was found and the officers left. After departing, a conversation between the agents established one of the two had noticed the name "Waldren" written a number of times on a piece of paper but, not appreciating its possible importance, he gave no thought to seizing it for subsequent use. However, after the conversation, the two agents again picked up the first sergeant of the unit and returned to the quarters of Sergeant Sessions. At this time—which, according to the sergeant, was some one-half hour after completion of the first search—the agents asked Sessions for, and were granted, permission to enter. In the ensuing conversation, he was asked if he had any piece of paper with the name Waldren written thereon. He replied in the affirmative, went over to the wastebasket, retrieved the paper and handed it to the agents. They thereupon departed, and this ended the chapter on the search and seizure until the document was produced at trial.

When the questioned document was offered into evidence, the defense objected on the grounds that a proper predicate for its admission had not been established. After further examination of the agent by counsel for both parties and the law officer, the objection was overruled and the document was admitted. When the accused took the witness stand in his own behalf, he testified substantially as follows: That he did not know the other accused, Sergeant Brown, intimately; that the only relationship between the two was that they were members of the same organization; that he willingly furnished exemplars of his handwriting to the agents on August 5 and August 8; that on August 9, after he had furnished the exemplars which involved writing the victim's name, he and his wife wrote the name Waldren on a piece of paper to compare their handwriting; that the paper was not destroyed but was retained for the use of the children; that the OSI agents on the first search found nothing; that during the search one agent handed certain papers over to the wife which she threw in the wastebasket, including the one in question; that upon the return of the agents, which was about one-half hour later, the agents asked for permission to enter and he granted the request; and that after some discussion the wife recovered the paper from the wastebasket and turned it over to the agents.

To supplement the testimony of the accused Sessions, and at his request, the following stipulation of facts was presented to the court-martial:

"With the consent of the accused and the trial counsel, the prosecution and defense will orally stipulate that, if Mr. Jack D. Hanson, who has previously testified in this case, the OSI agent, were present in court he would testify under oath concerning the search which was conducted on 12 August 1957 concerning the question: Did you find anything pertaining to this investigation in your search? He would testify as follows: Only one item pertained to Sergeant Sessions when we conducted the investigation. The agent with me was of the opinion that we were searching merely for checkbooks or something

in that line. He did not know the exact name which we were conducting the investigation on, referring to the name Waldren. So after we left Sergeant Sessions' quarters Mr. Gaines mentioned a piece of paper which he had seen which bore handwriting or some writing on it with the name Waldren on it. So we again picked up the first sergeant of the 6102nd Operations Squadron, who accompanied us on the search. We returned to Sergeant Sessions' house, and we asked him if we may go in and look in one of the drawers again, which Sergeant Sessions agreed. We did not find the piece of paper in which Mr. Gaines was looking for. So then I asked Sergeant Sessions if he had discarded any piece of paper which had some name like Waldren on it, at which time Sergeant Sessions said, 'Yes.' And then he got the piece of paper out of a waste paper basket and gave it to me, and Mr. Gaines said that it was the same that he had seen before. That constitutes the stipulation."

To complete the factual picture and to fit the testimony of Sessions and his other evidence in with his theory of defense, I quote certain statements found in the concluding arguments of defense counsel:

". . . Mr. Hanson escorted the two accused and two other gentlemen to Camp Fuchinobe for the purpose of giving handwriting exemplars. They voluntarily gave these handwriting exemplars. Would a guilty man knowing his rights furnish the Government with that many samples of his handwriting? Is that the normal action of a man who is guilty?

• • • • •

". . . We have an oral stipulation which the trial counsel entered into with us which pointed out that as a matter of fact they had left, and that later on one of the men, Mr. Gaines, stated that he remembers seeing a certain paper. Then they decided to go back to Sergeant Sessions' house. They stopped by and picked up the first sergeant and returned to Sergeant Sessions' house. Now, I ask you, do you think you can do that in two or three minutes? Of course not! There is bound to be some discrepancy, that is, a minor discrepancy in any observed incident such as in the case of the search: Who picked up the paper from the trash basket. . . . Was it his wife? Was it Sergeant Sessions? Realizing the circumstances that their house was being searched, I can imagine that they were a little bit apprehensive. Anyone is apprehensive of strange law enforcement or people going through a house searching. I think that is only a reasonable and logical deduction. It matters not whether Mrs. Sessions picked it up and handed the paper to the agent or whether it was Sergeant Sessions. They certainly did not withhold that. They made it available to the OSI. Sergeant Sessions has not anything at all to hide. He has voluntarily given as many exemplars as the OSI or Mr. Morales has wanted."

II

Before discussing the law on search and seizure, I desire to dispose of one preliminary but very important principle of law. Significantly, my associates make no mention of the defense testimony on the search and seizure. I surmise they fail to do so because they overturn the law officer's ruling on the fallacious theory that only the evidence which was produced prior to his ruling can be considered by us on appeal. That theory smacks too much of a game of wits and, as has been often said by the Chief Judge, the trial of an accused is not a game. If that principle is to govern us, then we should not draw an arbitrary time line, close our eyes to relevant testimony, and refuse to consider evidence on the near side of the line. If we are seeking to determine the true situation, we should consider all the testimony, and our duty is to support the law officer's ruling if it can be defended upon any legal ground. I have

**391**

always understood the law to be that a case does not end when the prosecution finishes and if an accused furnishes evidence which fills in the interstices left by the Government, he is bound by his disclosures. Therefore, it seems to me in this case we should look to see if this seizure was reasonable in the light of all the facts and circumstances and not whether it was reasonable when measured by the prosecution evidence alone. On appeal the evidence on an interlocutory issue should not be divided up between the parties and only that furnished by one side considered, merely because of the sequence in which it was presented. Errors made by law officers on interlocutory rulings, if adverse to an accused, can be waived or purged by his subsequent testimony, and it is a strange philosophy of law to permit an accused to take advantage of an error on appeal which he has rendered harmless at trial. Significantly, the Court's conclusion that in considering this question we are limited to the testimony before the law officer at the time he made his ruling is undocumented and has nothing but the Court's statement to support it.

It is rather difficult to find civilian cases which are factually on all fours with the one at bar, for most search and seizure cases in civilian jurisdictions deal with motions to suppress the evidence seized. In that form of proceeding, the judge hears all the evidence before ruling on the motion, but I am certain if a trial judge erred on his reason for not suppressing the evidence and at the trial the defendant testified he voluntarily consented to the search and seizure, no appellate court would hold the ruling to be erroneous. The reason underlying the view I express is that an accused is only protected if a search is unreasonable, and if he affirmatively establishes he waived his protection or the search was reasonable, he cannot come before us and say we must disregard his sworn testimony because he prejudiced himself.

A case very closely in point is Davis v United States, 328 US 582, 66 S Ct 1256, 90 L ed 1453. There the Supreme Court of the United States affirmed a conviction which rested on evidence obtained from an alleged unlawful search and seizure. Appropriately for my purpose, the reason for holding the search reasonable was predicated on a ground entirely different from the one used by the trial judge. In that case the basis for the trial judge's ruling not to suppress the property seized was that the defendant had voluntarily consented to the acts of the Government agents. I particularly mention this case for the reason that both the Court of Appeals for the Second Circuit and the Supreme Court followed the rule of law that they were not bound by the reasons assigned by the trial judge. The decision of the Supreme Court was based principally upon the ground that the property taken was public property in the custody of a citizen and therefore subject to seizure. Reference to the opinion of the Second Circuit Court reported in 151 F 2d 140 (1945), will disclose that that court affirmed the lower court not on the theory used by the trial judge but upon the principle the seizure was incident to a lawful arrest. I quote the portion of the opinion which satisfies me the holding of that court is contrary to the rule announced in the present decision:

". . . The question is whether the search so made was unlawful. The judge found that Davis' consent was 'voluntarily' given and for that reason denied the motion to suppress the evidence. We need not decide that that finding is wrong, for we can dispose of the case upon other grounds; but we must own to some doubt whether a consent obtained under such circumstances should properly be regarded as 'voluntary.' Davis must have known, under arrest as he was, that the officers were not likely to stand very long upon ceremony, but in one way or another, would enter the office."

When I delve below the surface of this Court's opinion, I find the concept that an interlocutory ruling becomes

fixed the moment it is uttered and, if erroneous, subsequent proceedings cannot change its propriety. Such is not the law, and I first turn to civilian authorities which I present as touching on that theory. In United States v Goldstein, 168 F 2d 666 (1948), the Court of Appeals for the Second Circuit had before it a motion for judgment of acquittal after the Government had finished presenting its evidence. At that point in the proceedings, there was grave doubt as to whether the Government had established the offense of perjury. The defendant took the stand and testified to certain facts which strengthened the Government's case. The defendant contended that on appeal the appellate court must test the ruling solely by the evidence before the trial judge when he ruled. The court in answer to that assertion made the following significant statement:

". . . On the assumption that it was erroneous not to grant the motion, the appellant could have taken his exception and declined to defend upon the merits. If the jury returned a verdict of guilty, he was in the same position he would have been had his motion been denied and could have vindicated his rights by taking an appeal. But no more now than before can he take advantage of an error if he makes that error harmless. In other words, if the evidence is short as the prosecution leaves it, he may take advantage of that. But if he amplifies the record on the facts in attempting to make a case for acquittal he must assume the risk of having the prosecution's case bolstered in the process."

In United States v Calderon, 348 US 160, 75 S Ct 186, 99 L ed 202 (1954), the Supreme Court was considering the question of corroborative testimony in an income tax evasion prosecution. In that instance, the accused made a motion for an acquittal after the prosecution had rested. However, thereafter he produced evidence which cured any deficiency in the Government's proof. The Supreme Court in that case stated:

". . . The reviewing courts, however, can seek corroborative evidence in the proof of both parties where, as in this case, the defendant introduces evidence in his own behalf after his motion for acquittal has been overruled. Cf. Bogk v Gassert, 149 US 17, 13 S Ct 738, 37 L ed 631."

In Ercoli v United States, 131 F 2d 354 (1942), the Court of Appeals for the District of Columbia had before it the question of the sufficiency of the evidence to establish a *corpus delicti*. There, an appropriate motion to direct a verdict at the close of the Government's case was made by the defendant. Thereafter, he took the witness stand and testified, and the appellate court made this meaningful statement:

"Applying this rule, therefore, the question is whether the corroborating evidence was sufficient in the present case. In answering this question we must consider all the evidence; not merely that presented by the Government. This results from the fact that, although appellant objected to the challenged testimony when it was first offered and, again, by his motion for a directed verdict, at the close of the Government's case, nevertheless he then proceeded to the presentation of his own case and testified in his own behalf to most of the same facts as those which appear in his statements to the officers. His testimony thus constituted a judicial admission and operated as an express waiver, with the same effect as an admission made in a pleading or in a stipulation."

Prior to this case, we have followed the civilian authorities, and I find no compelling reason to make an exception in this case. In United States v Hatchett, 2 USCMA 482, 9 CMR 112, quoted with approval by Judge Ferguson in United States v Kelly, 7 USCMA 218, 22 CMR 8, we had this to say:

". . . if any error arose by the law officer exceeding the fair bounds of cross-examination it was cured by the subsequent testimony

of the accused. His evidence not only established his guilt of the offense but also it paraded before the court-martial facts and circumstances he complains were brought to its attention by the law officer. . . . Considering the theory of defense, if any, and the procedure adopted, the question narrows to whether the testimony was obtained prematurely and if so, can the timing be the basis of prejudice? Assuming that when produced it might be, because not relevant at that time, it would be ridiculous to reverse a case because evidence was placed in the record by the Government prior to the time the accused voluntarily and judicially confessed to the same state of facts. That is not of controlling importance as the right not to be required to incriminate oneself is a privilege which must be claimed or it is waived. Valuable as it may be, its violation can be cured by the voluntary act of the person injured."

Of course, the suggestion is advanced that the application of the above-quoted rule might tend to bring pressure to bear on the accused to take the witness stand for fear of the consequences of his silence. That contention overlooks the obvious, for every person accused of a crime is under some pressure to testify lest the court-martial draw an unfavorable inference on his silence. However, when he elects to take the stand he is under the same compulsion, for he must decide whether to testify on the merits on all specifications, whether to limit his testimony on certain issues, or to confine his evidence to interlocutory matters such as warning or voluntariness. But even if compulsion exists in some cases, it cannot be used to shore up the Court's holding in the case at bar. Here, the Government's testimony went no further than to establish an authorization for the search and seizure and the accused did not testify on that facet of the controversy. He was not required to take the stand to dispute or put in issue any fact introduced by the Government, and he could rest with security on the weakness of its showing. His testimony was directed toward legalizing the search and not against its reasonableness. He attempted to use the evidence obtained by the agents as a sword to attack the Government and not as a shield to thwart its admissibility. He never entered the field of authorization; he for the first time in the case moved into the area of voluntariness. According to his testimony, he and his wife aided and abetted the Government agents in obtaining this questioned document, and he used the evidence as a springboard for his contention that he cooperated willingly in every conceivable way with the prosecution for he had nothing to hide. He was attempting to establish a clear conscience and an absence of criminality, and he made a reasonably good showing. While his tactics failed, they were not induced by the evidence of the Government.

## III

The previous part of my opinion is not intended to suggest the law officer used an incorrect touchstone for admitting the exhibit. On the contrary, I contend his ruling is well supported by the evidence. It is easy to state that testimony is hearsay and thus eliminate it from consideration but that assertion does not eliminate the competent facts which are in this record. When they are pieced together, there is substantial evidence this search was authorized by the commanding officer. The offense was committed in Japan, and the accused occupied quarters which were subject to governmental control. All that was needed to make the search legal was authorization from the commanding officer. The special agent sought the authorization from the appropriate officer, and he contacted his detachment commander. In his presence, the detachment commander made a personal telephone call to obtain the authority to search. Certainly none of that testimony is hearsay. Now, to whom did the detachment commander talk? Either he contacted the proper official or some stranger who would not be authorized to grant the re-

quest. Common sense, in addition to the presumption that, in the absence of evidence to the contrary, public officials perform their duties in a manner required by law, suggests that the conversation was between the detachment commander and the commanding officer of the base. But the identity of the individual to whom the detachment commander was talking does not long remain in doubt for it is made certain by the testimony of the agent that he had in his possession in court a written document executed by the commanding officer authorizing the search. This written authorization was not introduced into evidence, but secondary evidence is admissible to prove the contents of a document unless the parties require the best evidence. With that rule in mind, I have no hesitancy in stating the record shows by competent testimony that the commanding officer had authorized a search of accused's quarters by a specific agent. In this connection, I have not overlooked the evidence that the agent stated the letter was executed the following day. That is of no particular moment as we are not here dealing with a search warrant which is issued after the search. In the military, the authorization to search and seize does not need to be in writing, but it is good practice to confirm oral instructions. There is nothing in this record to show the document was not executed expressly for that purpose but, more important, it establishes beyond cavil that the commanding officer had been contacted by someone to obtain authority for the particular agent to search the quarters of the accused. The agent who was authorized to make the search went to the trouble to obtain authorization, and he requested it only on the one occasion. Ordinary military practice requires that he proceed through the chain of command, and that procedure was used in this case. Issues can be proved by circumstantial evidence, and this record points unerringly to the finding that the detachment commander was only a conduit through which authorization

passed from the commanding officer to the agent. Accordingly, if the facts in this case do not permit a finding by the law officer that proper authorization was obtained prior to the search, then the law officer and I both err.

## IV

It would be the work of supererogation for me to cite the many cases which hold a person may waive his right to contend his home was unlawfully searched and his property illegally seized. That principle of law brings me to my next point. Here, I believe the search was with the consent of the accused and the property voluntarily delivered to the Government agents. In commencing my discussion of this point, I start with the premise that when the Government relies on consent to establish the reasonableness of the search or seeks to justify its possession of the property on voluntary delivery, it must support its contention by clear and convincing evidence, and it must negate force or coercion. However, as previously indicated, the evidence introduced by the accused may be used to support either contention.

The theory of defense sometimes aids in resolving an issue, and this case is a perfect vehicle for application of the doctrine of consent. From suspicion to conviction, accused followed the line that he had nothing to lose by cooperating with the Government. To prove that theory to the court-martial, he first testified that, prior to the search, he voluntarily gave a number of exemplars of his handwriting. He did not testify that the original entry by the agents was involuntary, but his theory and subsequent conduct indicate the first search was not without his concurrence. As to the second search and the seizure of the questioned document, his evidence makes it crystal clear he voluntarily consented to both. According to testimony produced by him, when the agents reappeared they asked if they might come in and he extended them a welcome invitation. He was inter-

**395**

rogated as to whether he possessed a written paper with signatures thereon, and he not only volunteered the information that he knew where it was but he went much further and proceeded to the wastebasket, obtained the document, and handed it to the agents. There was no display of force, no coercion, no statement of authority to search or seize, and no search. This is not the situation where a person yields under compulsion. Here the accused was a willing finder and deliverer of the paper. Moreover, he explained the presence of the document by testifying that both he and his wife signed the paper and explained the reasons why they had practiced the signature and retained the document. Again, all his testimony was aimed at voluntary cooperation. All of his testimony was outside of any issue of an authorized search and seizure, but it was consistent with accused's theory of defense. He was perfectly willing to let the agents have the paper because he was anxious that he do nothing which would indicate a reluctance to aid. It is clear that voluntarily delivering the document was a strong reed in his defense, and it does speak of a clear conscience. Furthermore, his counsel's final argument emphasized, then re-emphasized, accused's theory that he was a willing worker with the Government agents and left no stone unturned in his efforts to produce whatever information was required. Unfortunately for him, the court-martial members elected to believe the testimony of the handwriting expert, but it is significant to note his conclusions were in no way based on the questioned exhibit. He made his determination from the handwriting exemplars which the accused judicially admitted were voluntarily furnished by him. Merely because the accused was not successful in his defense does not say it was not the best one available, but his testimony precludes him from claiming on appeal that the evidence does not support a finding the seizure was consensual.

In summing up my arguments on this facet of the controversy, I think it well worthwhile to mention the rule that searches are divisible from seizures. A search may be unreasonable but a seizure may be reasonable. Conversely, the latter may be unreasonable and the former reasonable. In the case at bar, I need go further than to hold the seizure of the property was not unreasonable. In line with all the authorities, if the property is voluntarily delivered, the taking is not contrary to law, and here the document was ferreted out by the accused and voluntarily delivered by him. Under those conditions, it was not unreasonable for the agent to take the writing. I would, therefore, conclude that, even pretermitting the question of authorization, this Court should sustain the ruling of the law officer on the ground that the Government agents rightfully obtained possession of the document.

V

That brings me to my last area of disagreement with my associates. Even if I were to accept the view that the exhibit was erroneously admitted in evidence, it appears to me my colleagues are treating these two accused as the Siamese twins. Apparently, under their theory, the two accused must succeed or fail as though they were one. There are certain cases in which the admission of incompetent evidence against one accused results in prejudice to the other, but harm to Sessions in this factual setting does not flow to Brown. About all I gather from the majority opinion is that my associates take the view that any error in admission of testimony against one co-accused must of necessity harm both. I believe the law to be that unless all persons tried together are prejudiced, only the one harmed is entitled to a rehearing. Otherwise every error prejudicial to one accused alone would require reversal as to all. Of course, whenever two or more persons cooperate in the commission of any offense they are often charged and tried jointly. Usually when a joint trial is held there is a certain amount of commingling

of testimony and credibility, but in the case at bar there was none.

Both accused took the stand and each denied he had ever seen the forged checks. Each claimed there was only a speaking acquaintanceship with the other. The evidence supporting a finding against Brown consisted of the testimony of a handwriting expert that Brown wrote a certain part of the forged documents; and that when the instruments were subjected to infrared light, a bank number appeared on the checks and that the records of the bank showed a check book carrying those numbers had been issued to the accused Brown. While Brown disputed the testimony of the expert, his explanation of his manipulations with bank accounts and the throwing away of the check book impaired his credibility. However, neither the Government nor Brown were aided by the testimony of Sessions. His credibility made not one whit of difference in the outcome of Brown's case. One might just as well say that had the Government improperly proved that Sessions was seen cashing the checks that Brown was prejudiced. Under that theory, any testimony erroneously admitted against one accused *ipso facto* would be prejudicial against the other, regardless of their theory of defense. I do not concede the law goes that far and in the case at bar I pose these questions. Assuming the court-martial disbelieved Sessions, how would that impair Brown's defense? Had the court-martial found Sessions not guilty, could Brown raise the issue of an illegal seizure? I would answer the first by saying the Court's opinion of Sessions would not affect Brown's credibility and it would not weaken any evidence in his behalf offered by Sessions for the simple fact that he testified neither for nor against Brown. The answer to the second should be obvious.

In United States v Bass, 8 USCMA 299, 24 CMR 108, Judge Ferguson, speaking for the Court, announced the rule that one who has no proprietary or possessory interest in the premises searched or property seized may not suppress evidence obtained in violation of the rights of another. Neither can he object to the admission of any evidence on that ground. Brown undoubtedly had an objection on the grounds that as to him the document was immaterial for it in no way shed light on his guilt or innocence, but no objection was made on that basis. In this case failure to object is unimportant for I am willing to assume inadmissibility as to Brown. That merely poses the question of prejudice and as previously stated I find none.

While my associates document their conclusion with two cited cases, I find them inapposite. In Cucchia v United States, 17 F 2d 86 (CA 5th Cir) (1927), the basis for the court's holding is expounded in this language:

". . . The error in the ruling on the evidence was clearly prejudicial to Cucchia, and should not have been admitted even as against Megna, because the defendants were acting in concert, and they corroborated each other in their testimony. The discrediting of Cucchia as a witness weakened Megna's defense. Besides the erroneous assumption in the charge that Megna was the one who attempted to bribe the commissioner was allowed to be used as the basis of an inference against that defendant, and was calculated to confuse the jury."

The doctrine announced in United States v Kidd, 153 F Supp 605 (WD La), is likewise of no support to my associates. The nub of that decision is the holding that improperly received evidence was bound to influence the jury against the co-accused because it was found in his car.

I could cite the two cases as supporting my conclusion but I prefer to rely on the general rule that the admission of evidence, assuming it incompetent, is not to be made the basis for reversal for any accused unless it might reasonably prejudice him.

For the reasons hereinbefore advanced, I would affirm the decision of the board of review.