UNITED STATES, Appellee

v

ANTHONY E. VAIL, JR., Staff Sergeant, and
JAMES E. BRAZIER, Basic Airman,
U. S. Air Force, Appellants

11 USCMA 134, 28 CMR 358

No. 13,100

Decided January 15, 1960

Captain *Prichard E. Gray* argued the cause for Appellants, Accused.
With him on the brief were Lieutenant Colonel *James L. Kilgore* and
Captain *John H. Leonard.*

Major *Lawrence J. Gross* argued the cause for Appellee, United States.
With him on the brief were Colonel *John F. Hannigan,* Lieutenant Colonel
*Robert W. Michels,* and Major *Timothy G. O'Shea.*

Opinion of the Court

ROBERT E. QUINN, Chief Judge:
This case brings up for review the admissibility in evidence of a statement made by Brazier before trial.

A charge of larceny of certain guns belonging to the United States, including two machine guns, was lodged against the accused and another airman, all of whom were stationed at the Sidi Slimane Air Base, Morocco. At trial each accused was represented by separate counsel. The prosecution showed that the base authorities suspected an attempt would be made to steal guns from a warehouse on the night of March 31, 1958, for later sale to Moroccans. They placed the building, which was guarded by Cox, one of the accused, under observation from a vantage point about 600 feet from the warehouse. They also had an informer Thibodeau working with Brazier.

In a car procured by Vail, Brazier and Thibodeau drove to the warehouse area on the night in question. Cox, who knew Brazier, let them inside the building.[1] Obtaining a screwdriver from Cox, Brazier and Thibodeau broke open a box from which they removed two .30 caliber machine guns, a .45 pistol, and a Lyle gun. These

---

1. The board of review set aside the findings of guilty as to Cox on the ground that the evidence did not show

beyond a reasonable doubt he was "a knowing party to the larceny." ACM 15901, March 23, 1959.

articles were carried out of the building. In a few minutes Brazier and Thibodeau re-entered the warehouse. The provost marshal and his aide went after them. At gun point, they relieved Cox of his guard weapon and called out to Brazier to come forward. Brazier emerged from behind some boxes. Major Crisp, the provost marshal, testified that he then "asked Brazier to show . . . [him] where the guns were which had been removed from the warehouse." Earlier, Thibodeau had testified to the same statement and the accused's reply, without objection from any of the three defense counsel, but on cross-examination Brazier's defense counsel attempted to show that Major Crisp used a "peremptory" tone of voice, and that he did not inform the accused of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. However, when the guns and their wooden containers were offered into evidence, Brazier's counsel objected to their admission. He contended in part that the articles were inadmissible because they were obtained by reason of "the statement of the accused while under suspicion . . . [and without being] advised of his rights under Article 31."

Two preliminary questions are raised by the record of trial. The first is whether Vail can, under the circumstances of the case, avail himself of the purported denial of a right belonging to Brazier. Cf. United States v Sessions, 10 USCMA 383, 27 CMR 457. The second is whether Brazier waived his right to object to the admission in evidence of the guns by failing earlier to object to the testimony of the conversation which led to their seizure. See United States v Williams, 8 USCMA 443, 24 CMR 253. However, we prefer to pass over the preliminary questions to reach the heart of the appeal. The real question is whether an accused apprehended in the very commission of a larceny must be advised of his rights under Article 31 as a condition to the admission of testimony of his reply to a demand to produce stolen property.

In United States v Minnifield, 9 USCMA 373, 379, 26 CMR 153, we noted that "it is a liberal and enlightened, rather than a narrow and grudging, application of Article 31 that is best calculated to insure to the military the preservation of our traditional concepts of justice and fair play." However liberal the application of Article 31, it cannot be applied without regard to the circumstances under which the statement is made. We have emphasized that Article 31 is not applied indiscriminately to all pretrial statements by the accused. In United States v Schilling, 7 USCMA 482, 22 CMR 272, we held that the provisions of Article 31 do not bar testimony of pretrial admissions of guilt by the accused in response to questioning by private persons. In United States v Hopkins, 7 USCMA 519, 22 CMR 309, we held that the Article did not apply to questions about an apparent shortage in a routine audit conducted by a regular auditor; and in United States v Dandaneau, 5 USCMA 462, 18 CMR 86, we sustained the admission of a pretrial statement by the accused to an officer on the ground that there was sufficient evidence to support the law officer's ruling that the situation was not one within the meaning of Article 31.

Slight differences in the factual background may bring the case within the operation of Article 31 or effect its exclusion. United States v Nowling, 9 USCMA 100, 25 CMR 362; United States v Doyle, 9 USCMA 302, 311, 26 CMR 82, dissenting opinion by Chief Judge Quinn. Had the accused in this case been taken to the air police office and asked to disclose where he had put the stolen property, unquestionably Article 31 would preclude admission of his response, in the absence of preliminary advice to him of his rights under the Article. United States v Bennett, 7 USCMA 97, 100, 21 CMR 223; United States v Taylor, 5 USCMA 178, 17 CMR 178. Here, the demand was not made at a time *after* the offense in an effort to obtain evidence from the accused which might help convict him. It was addressed to the accused as a part of his apprehen-

135

sion in the actual commission of the offense. Common sense tells us the arresting officer cannot be expected to stop everything in order to inform the accused of his rights under Article 31. On the contrary, in such a situation he is naturally and logically expected to ask the criminal to turn over the property which he has just stolen. That is the substance of Major Crisp's demand. We think Congress did not intend Article 31 to stay the natural outcome of an apprehension until the police officer informed the accused of the nature of the accusation and that he does not have to make any statement but if he does the statement can be used against him in a trial by court-martial. The nature of the accusation is manifest to an accused who is caught "red-handed." Equally obvious to him is the fact that he must surrender the stolen property under his immediate control and that the property will be used as evidence against him. In our opinion, Article 31 is inapplicable to the situation presented in this case. We hold, therefore, that the accused's objection to the admission of the guns in evidence was properly overruled.

The decision of the board of review is affirmed.

LATIMER, Judge (concurring):

I concur.

As I recently pointed out in my concurring opinion in United States v Souder, 11 USCMA 59, 28 CMR 283, we have not applied Article 31, Uniform Code of Military Justice, 10 USC § 831, literally in determining whether conversations are within its purview. Rather, we have required that the record must show the existence of certain conditions before that Article's requirements come into play. Under the posture of the evidence in this case, I conclude those conditions are not present for, in my view, the Major's demand as to where the weapons were was neither an interrogation within the meaning of Article 31 nor in furtherance of any official investigation of an offense. To the contrary, there had been an unlawful taking of some Government property, but the thieves were in the process of asporting more and in this instance, unlike Souder, supra, the offense was still in the making. The question was put to a thief by an apprehending officer in the process of catching him "red-handed" in the commission of his crime under conditions which, to say the least, prompted action and not carefully thought out words of advice. The officer had a duty to recover the stolen property and prevent it from falling into Moroccan hands, even if he had to use coercive methods. But, in addition to this officer's duty, we would ignore the obvious if we closed our eyes to the facts that apprehending felons in the commission of crimes of violence is dangerous business and Congress did not intend to add to the difficulties by requiring officers to interrupt their apprehensions with a recitation of rights and privileges which at that time would be useless. As the Chief Judge suggests, one caught in the course of committing a serious crime hardly needs to be informed of the nature of his offense and that what he says or does will be used against him in a court-martial. At that time, he is no doubt painfully aware of the nature and consequences of his misconduct. But, more important, it would be contrary to common sense to require officers in situations comparable to this Major to halt their efforts to retrieve stolen Government property, inform the culprits they need not point out where the loot was hidden, and then request them to do so. With a loaded .38 in the hands of the apprehending officer, I am certain such a warning would be ineffectual.

FERGUSON, Judge (dissenting):

I dissent.

The essence of my brothers' opinion is that military detectives may question an accused suspected of an offense without warning under Uniform Code of Military Justice, Article 31, 10 USC § 831, provided they do so at the scene of the crime rather than after the offender has "been taken to the air police office." Thus, the locus of the interrogation is made to control the

application of a positive Congressional enactment.

The accused were found guilty of larceny, in violation of Code, supra, Article 121, 10 USC § 921, along with Airman Cox. With some mitigating action on the sentence, intermediate appellate authorities affirmed the convictions of Vail and Brazier. However, the board of review, exercising its fact-finding powers, set aside the findings of guilty with respect to Cox. We granted review on the sole issue of whether Vail and Brazier were prejudiced by receipt in evidence of the stolen property over objection that it was obtained in violation of Brazier's rights.

According to the Government's case, Brazier needed funds and conceived the idea of stealing weapons from an Air Force warehouse in Morocco and selling them to local inhabitants. He took one Thibodeau, a Government informer, into his confidence. Thibodeau immediately reported the matter to the Office of Special Investigations and kept them informed of all developments.

Vail and Cox were also made a part of the conspiracy. After plans had been made, Vail furnished an automobile to Brazier and Thibodeau. They drove the vehicle to the warehouse in question, parking it approximately one hundred yards away. They were admitted to the warehouse by Cox, who had been assigned the duty of guarding its contents that evening. Thibodeau and Brazier proceeded to a "fly-away" box. Armed with a screwdriver furnished by Cox, they opened the box and removed two machine guns, one pistol, and a Lyle gun. These items were transported to the vehicle and placed on the rear seat. After Thibodeau and Brazier returned to the warehouse, Major Crisp, the Base Provost Marshal, and a Sergeant Davis entered with drawn pistols. They disarmed Cox and called upon Brazier and Thibodeau to surrender. When the two men appeared from a hiding place behind some boxes, they and Cox were spread-eagled on the floor. A search of Brazier and Thibo-

deau disclosed that they were unarmed. Major Crisp then left the warehouse and, to summon further aid, fired two shots in the air. He returned immediately. What then transpired may be best described by quotation of his testimony:

"Q Will you continue?
"A *I then asked Brazier to show me where the guns were which had been removed from the warehouse. He showed us where they were and we then took custody of the weapons approximately 75 to 100 yards immediately south of the warehouse.*
"Q Where were they?
"A They were in the back seat of a car, I believe a '53 Ford. I don't recall the actual position on the base. One of the boxes contained a forty-five, which was on the floor, a large suitcase containing a Lyle gun on the seat and immediately behind the box toward the back of the seat were two .30 caliber machine guns.

.   .   .   .   .

"Q . . . *Were you aware of the place which you claim Prosecution Exhibits 1 through 4 were taken on the night of 31 March, when you first entered the warehouse?*
"A *I—When I first entered the warehouse?*
"Q *Yes.*
"A *No, I was not.*
"Q *How did you find out where the prosecution exhibits were?*
"A *Where they were?*
"Q *Yes.*
"A *Airman Brazier led Sergeant Scarborough over to the car where they had been placed.*
"Q I believe you testified before that you had a pistol, thirty-eight?
"A This is correct.
"Q Did you shoot that pistol at any time?
"A After all of the suspects in this, which were at that time Airman Brazier, Airman Cox, and Airman Thibodeau, had been spreadeagled on the floor of the warehouse and were under guard, I went outside of the warehouse and fired two rounds in the air to bring in assistance.
"Q *So that the accused Airman*

**137**

Brazier knew that the pistol was loaded?

"A *I presume he may have. I did not point the pistol, but I let them know it was loaded and that I intended to use it.*

"Q *And I presume, in all probability, when you said to the accused, 'If you don't come out, I will shoot,' he thought you meant what you said?*

"A *I am sure he did.*

"Q *And did you intend to?*

"A *I certainly did.*

.   .   .   .   .   .

"Q *Did you ask Airman Brazier whether he would take you to where these weapons were?*

"A *My words were, 'Will you show us now where the weapons are that have been removed from the warehouse?'*

"Q *Did you say it in as peremptory a tone as you just said it?*

"A *I would say my words to Brazier were, 'Show us where you put the weapons you took from the warehouse.'*

"Q *Did he reply?*

"A *Yes.*

"Q *Did he immediately take you over to where the weapons were?*

"A *He took Sergeant Scarborough.*

"Q *And, as a result of that, Sergeant Scarborough discovered Prosecution Exhibits 1, 2, 3 and 4?*

"A *This is correct.*

"Q *Did you warn Airman Brazier of his rights under Article 31 at any time during the period we have just discussed?*

"A *I did not.*

"Q *Did you inform him of his rights with respect to making a statement?*

"A *I did not.*

"Q *Did you tell him he did not have to take you to where those weapons were?*

"A *I did not.*" [Emphasis supplied.]

After the foregoing testimony was adduced, counsel for Brazier objected to the receipt in evidence of the mentioned prosecution exhibits on the basis of the failure to advise accused of his rights under Code, supra, Article 31. The law officer overruled the objection and admitted the exhibits.

My brothers conclude that Article 31, supra, "is inapplicable to the situation presented in this case." They cite no authority for that position, but simply reason that an accused "must surrender the stolen property under his immediate control," and that it is obvious to him "the property will be used as evidence against him." I am at a loss to see how these factors are relevant to the presence or absence of a Congressionally required warning or in what manner they may lead to a reasoned belief that Code, supra, Article 31, does not apply to a demand, reinforced with a loaded pistol, that an accused produce evidence against himself. On the contrary, I believe our prior decisions dictate an opposite result, as do the terms of the Article itself. Tracing the basic development of holdings in this area will make my meaning clear.

In United States v Josey, 3 USCMA 767, 14 CMR 185, we were confronted with the admission in evidence of accused's return of stolen money to the victim of his larceny. It appeared that accused snatched the victim's wallet from the latter's hand. On the following day, the victim, accompanied by an eyewitness to the theft and a criminal investigator, visited accused's barracks. He demanded the return of the money with the promise that charges would not be pressed. The promise had the apparent approval of the investigator. The money was returned with an apology. In holding that the admission thus obtained should have been excluded from evidence, we pointed out, at page 773:

". . . A return of the money to the alleged victim—being conduct on the part of the accused relevant to the question of guilt or innocence—constituted an admission by him to the same extent that words might have had this effect."

We thus made it clear that incriminating conduct, such as the return of stolen property, should be treated

as a statement within the meaning of Code, supra, Article 31. See also United States v Figueroa, 14 CMR 804; United States v Reid, 18 CMR 341; and Maguire, *The Warning Requirement of Article 31(b): Who Must Do What To Whom and When,* 27–100–2 Military Law Review 1, at page 19, September 1958.

In United States v Taylor, 5 USCMA 178, 17 CMR 178, criminal investigators received information to the effect that the accused had marihuana in his possession. They repaired to his hut with the officer of the day and conducted a search. The accused was required, without warning under Code, supra, Article 31, to point out his belongings. Marihuana cigarettes were discovered in the pocket of his overcoat. He was, in the words of Judge Latimer, "hustled forthwith to the provost marshal's office." A majority of the Court concluded it was prejudicial error to receive in evidence accused's identification of the coat as his property. Judge Latimer joined in reversal of the cause on the basis that the evidence thus obtained rendered accused's subsequent confession equally inadmissible.

In United States v Holmes, 6 USCMA 151, 19 CMR 277, military detectives suspected the accused of attempting to steal gasoline. They visited his barracks and, without appropriate warning, required him to point out his clothing. Upon examination of the items furnished them, the odor of gasoline was detected. In reversing accused's conviction for the receipt of this information at the trial, we declared that the accused's physical act of pointing out his clothing amounted to a statement within the meaning of Article 31 and that it was incumbent upon criminal investigators to advise him of his rights prior to asking for such facts.

A similar problem faced us in United States v Bennett, 7 USCMA 97, 21 CMR 223. There, we unanimously held that accused's pointing out his locker and clothing at the request of an investigator amounted to a statement, the obtaining of which required warning under Code, supra, Article 31. These events occurred within four hours after accused had allegedly raped an eleven-year-old child. Accused's conviction was affirmed, however, as "the prosecution scrupulously refrained from using any evidence that was obtained prior to warning."

More recently, in United States v Williams, 10 USCMA 578, 28 CMR 144, accused was asked for the clothing which he had worn "that night" after being advised he was suspected of "committing an offense." Accused indicated that the items sought were in his laundry bag. These events occurred in his barracks and within a few hours of an alleged rape. We held admission of this evidence prejudicial, as it appeared accused was not advised of his rights under Code, supra, Article 31, prior to the request that he hand over his clothing. We predicated our reversal upon our former holdings in United States v Taylor and United States v Holmes, both supra.

From the cases cited, three principles may be derived. First, physical conduct which amounts to an incriminating admission is the equivalent of a "statement" and is protected by the shield of Article 31. United States v Josey, supra; United States v Taylor, supra. Secondly, requiring an accused to connect himself with incriminating evidence or to hand over items which may be used against him under circumstances tending to connect him with them amounts to physical conduct equivalent to a "statement." United States v Taylor, supra; United States v Bennett, supra. Finally, if an accused is required to engage in physical conduct equivalent to a statement without prior warning under Code, supra, Article 31, such conduct and its fruits *so connected with him* are inadmissible. United States v Williams, supra; United States v Nowling, 9 USCMA 100, 25 CMR 362.

When these principles are applied to the situation depicted by this record, only one result is possible. Major Crisp demanded that accused

Brazier lead him to the stolen weapons. At the time, Crisp did not know where they were, nor was he certain of the items which had been stolen. His surveillance of the scene from afar permitted him only to observe that two men left the warehouse carrying objects of an indefinite nature. Brazier's direction of the investigators to the automobile involved not only established that these objects were indeed weapons, but also unmistakably established his connection with their asportation. As no warning was given prior to Crisp's order to Brazier, it is crystal clear that the concepts described above come into play, and that his pointing out of the loot was inadmissible.

Moreover, an even stronger reason for excluding the evidence in question appears here than did in United States v Taylor, United States v Holmes, and United States v Williams, all supra. In those cases, the error we decried concerned only the failure to warn the particular accused. Here, however, Major Crisp had made it clear to all concerned that he was armed and willing to use his weapon. Its presence, under the circumstances, added to the peremptory character of his demand that Brazier "show us where the weapons are." Thus, as Judge Latimer admits, the facts disclose not only lack of proper warning but the employment of coercive measures equally forbidden by the Code. True, Major Crisp was undoubtedly justified in his cautious approach to men engaged in the theft of major armament items. That does not, however, remove the obvious effect of such tactics upon Brazier when demand was made for the location of the guns.

What, then, are the considerations which lead the Court to depart from the rationale of our former opinions? At the outset, my brothers remark that we "have emphasized that Article 31 is not applied indiscriminately to all pretrial statements by the accused." This is undoubtedly true, but, in the cases cited in support of that declaration, the Article was not invoked for reasons totally foreign to this record. Thus, in United States v Schilling, 7

USCMA 482, 22 CMR 272, the "statement" was a personal conversation between the accused and his victim overheard by a law enforcement agent. In United States v Hopkins, 7 USCMA 519, 22 CMR 309, a Navy auditor was engaged in making a physical count of postal funds charged to the accused. When he was unable to arrive at a correct balance, he asked the accused for the rest of the money. Accused immediately confessed that he was "short." We unanimously held that the auditor had no duty to warn the accused of his rights prior to the question, as it was clear he suspected him of no offense. Similarly, United States v Dandaneau, 5 USCMA 462, 18 CMR 86, involved a personal, albeit incriminating, conversation between the accused and a former commanding officer. Surely, these cases have little application to the situation confronting us.

In like manner, it is urged that slight "differences in the factual background may bring the case within the operation of Article 31 or effect its exclusion." Cited for this proposition are United States v Nowling, supra, and the dissenting opinion of the Chief Judge in United States v Doyle, 9 USCMA 302, 26 CMR 82. Again there is some basis for this assertion, provided, of course, that the "difference" is material. For example, in United States v Nowling, supra, we pointed out that an Air Policeman was required to warn the accused of his rights under Code, supra, Article 31, prior to requesting his pass, because of his knowledge that the accused had been previously restricted. Hence, he suspected that the latter was absent without proper authority. Accordingly, an Article 31 warning was necessitated. In United States v Doyle, supra, the same factor was involved. Chief Judge Quinn's disagreement with the reversal in that case was predicated upon a conclusion that the accused was properly advised by one of the two questioners involved and that the other *did not* suspect him of any offense at the time of the interrogation. Once again, I point out that these factual differences are not pres-

ent here, for it can scarcely be argued that Major Crisp did not suspect accused of stealing weapons in view of the information he had received from Thibodeau and Brazier's presence in the warehouse. Such an assertion would be simply impossible of belief. United States v Doyle, supra.

Finally, it is baldly stated that "Congress did not intend Article 31 to stay the natural outcome of an apprehension until the police officer informed the accused of the nature of the accusation and that he does not have to make any statement." No authority is cited for this conclusion. The reason for its lack becomes apparent, however, when it is considered that the legislative history is entirely silent on the subject. See Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 983–992; House Report No. 491, 81st Congress, 1st Session, page 19. Moreover, it is directly contrary to our previous assertions in United States v Taylor, supra; United States v Holmes, supra; United States v Bennett, supra; and United States v Williams, supra. Thus, *Taylor*, supra, involved an accused who was then in the actual commission of the offense of possessing marihuana. United States v Holmes, supra, involved a defendant who had just completed an attempted larceny. *Bennett* and *Williams*, both supra, involved information elicited without warning within a few hours of the offenses charged. In none of these cases had the accused "been taken to the air police office and asked to disclose where" the property sought was located.

My position with respect to the issue here presented is clear. I prefer to adhere to the well-reasoned precedents applicable to Major Crisp's conduct and decide the question before us in accordance with our decisions in United States v Taylor, United States v Holmes, United States v Bennett, United States v Nowling, and United States v Williams, all supra. To depart from them less than five months after we reversed the last-named case is to afford no more than *ad hoc* treatment to an important question by judicially inserting in an unambiguous and simply phrase statute an exception for which there is no basis either in the history of its enactment or in the interpretation previously afforded it. I leave to the services the unenviable task of attempting to guide their law enforcement agencies by drawing the fine distinctions utilized by the majority in holding there was no duty upon this provost marshal to warn Brazier.

I would reverse the decision of the board of review concerning the accused Brazier and authorize a rehearing. With respect to the accused Vail, it appears from the record that the evidence with respect to his guilt is not "in such delicate balance, [that] it is impossible to say . . . the prejudicial effect of improperly received evidence was limited to a single accused." United States v Sessions, 10 USCMA 383, 27 CMR 457, at page 389. Thus, the violation of Brazier's rights does not entitle Vail to reversal. Agnello v United States, 269 US 20, 46 S Ct 4, 70 L ed 145 (1925); cf. McDonald v United States, 335 US 451, 69 S Ct 191, 93 L ed 153 (1948). Accordingly, I would affirm the decision of the board of review concerning the findings and sentence in Vail's case.