*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

_____

**UNITED STATES**
Appellee

**v.**

**Ernest M. RAMOS, Boatswain's Mate First Class**
United States Coast Guard, Appellant

**No. 17-0143**
Crim. App. No. 1418

Argued April 25, 2017—Decided July 19, 2017

Military Judge: Eric D. Masson

For Appellant: *Lieutenant Jason W. Roberts* (argued).

For Appellee: *Lieutenant Sharyl L. Pels* (argued); *Stephen P. McCleary,* Esq. (on brief).

Chief Judge ERDMANN delivered the opinion of the court, in which Judges RYAN, OHLSON, and SPARKS, joined. Judge STUCKY filed a separate dissenting opinion.

_____

Chief Judge ERDMANN delivered the opinion of the Court.

Contrary to his pleas, a panel of officers sitting as a special court-martial convicted Boatswain's Mate First Class Ernest M. Ramos of one specification of conspiracy to manufacture and distribute marijuana, three specifications of making false official statements, and one specification of wrongful possession of marijuana with intent to distribute, in violation of Articles 81, 107, and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 907, 912a (2012). Ramos was sentenced to a bad-conduct discharge, confinement for ninety days, and a reduction to E-3. The convening authority approved the sentence as adjudged. The United States Coast Guard Court of Criminal Appeals (CCA) set aside and dismissed two of the three false official

statement specifications, but otherwise approved the findings and sentence.

Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012), warning rights are required when "(1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014) (footnote omitted). We granted review in this case to determine whether Ramos was entitled to Article 31(b) rights during an interview with law enforcement officers where he initially was reporting details of a threat against him and his wife but, during the course of the interview, law enforcement officers suspected him of an offense under the UCMJ.[1] Under the circumstances presented in this case, we hold that Ramos was entitled to Article 31(b) warnings and the military judge erred when he denied Ramos's motion to suppress the unwarned statements.

## BACKGROUND

In December of 2013, Ramos's wife entered into an agreement with Mr. Hart (Hart), a civilian, to form a marijuana-growing business under Washington state's recently enacted recreational marijuana law. When the costs became too high, Mrs. Ramos informed Hart that she had to back out of the arrangement. At a subsequent meeting between Hart and the Ramoses, Hart allegedly stated: "I'm going to get my money somehow or another. I'm showing up at your job tomorrow." Ramos perceived this as a threat and the next day he informed his command of a possible danger to himself, his wife, and the base. Ramos first spoke to his immediate supervisor, informing him that there were threats from a "dangerous person," due to his wife's

---

[1] We granted review of the following issue:

> Whether Appellant was entitled to Article 31(b), UCMJ, warnings at any point during his interrogation by CGIS, and if so, whether he was prejudiced by the admission of any of his statements.

withdrawal from a business agreement. Ramos voluntarily stated that the business involved legally growing marijuana, but added that his name was not on any of the paperwork. The supervisor determined that Ramos was genuinely concerned about Hart's threat and sent him to the operations officer. Ramos repeated the story to the operations officer, who informed the executive officer of the details, including the fact that a marijuana growing business was involved.

The executive officer met with Ramos, where he again relayed his story and stated that only his wife's name was on the marijuana business paperwork. The executive officer asked Ramos if he had any marijuana seeds or plants in his home to "game plan how to mitigate the threat." Ramos answered in the negative, but indicated that he did have growing equipment in his garage. The executive officer alerted base security as to the possible threat and then contacted the Coast Guard Investigative Service (CGIS), informing them that the threat was over a civil dispute involving Ramos's wife's recreational marijuana-growing business. CGIS told the executive officer to send Ramos to the CGIS office for an interview.

Later that day, Ramos was interviewed by CGIS Special Agents (SA) Stinson and Chavez. SA Stinson testified that the agents initially were attempting to understand the threat to Ramos and his wife. SA Stinson testified that Ramos mentioned "fairly early" in the interview that his wife was involved in recreational marijuana production and that he became suspicious of Ramos because he kept referring to the business as "we" and "ours." Later in his testimony, SA Stinson indicated that he knew of the involvement of marijuana before the interview commenced. In either event, SA Stinson testified that he suspected Ramos of a UCMJ violation "during probably the last half of the Ramos interview, um, and we tried to keep him on point dealing with only the threat." SA Stinson testified that while the agents asked Ramos questions about the marijuana business that could potentially incriminate him, they did so because they were "focused on preventing serious bodily harm" to Ramos and his wife.

After about forty-five minutes, the SAs took a break from the interview to discuss "the way forward" and whether they needed to advise Ramos of his Article 31(b) rights "because it's clearly going to be about marijuana growing." During this break, SA Stinson coincidently received a phone call from Hart who claimed that a member of the Coast Guard was involved in a marijuana business and agreed to come in and be interviewed. At that point SA Stinson concluded the interview with Ramos.

SA Stinson interviewed Hart and his wife about the business arrangement and was informed that there were some marijuana plants in Ramos's garage. After the interview, Hart called SA Stinson and told him that Ramos had destroyed the marijuana plants, at which time SA Stinson decided to do an undercover operation. An undercover officer, along with Hart and his wife, went to the Ramoses' residence, met with them, and retrieved marijuana, seeds, and other marijuana-related items.

Prior to trial, the defense moved to suppress all of Ramos's statements to SA Stinson and SA Chavez due to their failure to advise him of his Article 31(b) rights. The military judge denied the motion, finding that the agents did not specifically question Ramos about his involvement in the business nor did they ask if he possessed any plants at his residence. The military judge found that SA Stinson had no requirement to give Ramos his Article 31(b) rights because SA Stinson was not conducting a law enforcement or disciplinary inquiry, but was instead focused on "force protection." Additionally, the military judge held that even if there was an Article 31(b) violation, there was no prejudice because Hart's independent call triggered the undercover operation that would have occurred whether or not Ramos was interviewed.

The CCA held that the military judge did not err or abuse his discretion in denying the defense's motion to suppress the statements because the agents' questions were focused on identifying and mitigating the threat.

## ANALYSIS

On a motion to suppress, this court reviews a military judge's ruling for an abuse of discretion. *United States v.*

*Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995). As previously stated by this court:

> "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000). "When there is a motion to suppress a statement on the ground that rights' warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law de novo." *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000). "[O]n a mixed question of law and fact . . . a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *Ayala*, 43 M.J. at 298.

*Jones*, 73 M.J. at 360 (alteration in original).

Ramos argues that the military judge abused his discretion by not suppressing his unwarned statements that he was not involved in his wife's marijuana business. He contends that, under the totality of the circumstances, SA Stinson could reasonably have been considered to be engaging in a law enforcement inquiry when he asked specific questions regarding the marijuana business. Ramos argues he was prejudiced by this failure, allowing the government to improperly use that statement as a basis for his remaining Article 107 (false official statement) conviction.

The government responds that Ramos was not entitled to an Article 31(b) rights advisement because the purpose of the CGIS interview was force protection, i.e., to determine the scope and severity of the threat, and not for a law enforcement or disciplinary purpose. As to the *Jones* factors, the government only disputes the second factor, which is whether the agents "interrogate[d] or request[ed] any statement," and concedes the other three factors in favor of Ramos. *Jones*, 73 M.J. at 361. The government also argues that this was not a "mixed purpose" case, but instead the agents' questions had only an operational purpose. *See United States v. Cohen*, 63 M.J. 45, 50 (C.A.A.F. 2006). Accordingly, the government contends that this court and its predecessor have long held that Article 31(b) rights

advisements are not required when the questioning is designed to "fulfill operational responsibilities," as was the focus in this case. *See id.*

## DISCUSSION

### Article 31(b) Rights

Generally, an accused must be informed of his *Miranda* rights prior to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). In military jurisprudence, Congress has provided military members, under Article 31(b), with a rights' warning requirement that is broader than those required by *Miranda. See United States v. Swift*, 53 M.J. 439, 445 (C.A.A.F. 2000). Article 31(b), UCMJ, states that an accused may not be interrogated or requested to make a statement if that person is suspected of committing an offense without first informing the accused "of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

"Under Article 31(b)'s second requirement, rights warnings are required if the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry," which "is determined by assessing all the facts and circumstances at the time of the interview to determine whether the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity." *Jones*, 73 M.J. at 361 (internal quotation marks omitted) (citations omitted). In interpreting Article 31(b), this court has recognized the difference "between questioning focused solely on the accomplishment of an operational mission and questioning to elicit information for use in disciplinary proceedings." *Cohen*, 63 M.J. at 50. However, "[w]here there is a mixed purpose behind the questioning, the matter must be resolved on a case-by-case basis, looking at the totality of the circumstances, including whether the questioning was 'designed to evade the accused's constitutional or codal rights." *Id.* (internal quotation marks omitted).

The questions by the agents in this case present a classic "mixed purpose" as they involved both an operational mission and elicited information about a suspected UCMJ violation.[2] *See id.* We must therefore look at the totality of the circumstances to determine whether the CGIS agents' questioning implicated their law enforcement investigative authority. *Id.* The military judge, in this case, made the following findings of fact:

> During [CGIS] interview the agents very quickly ascertained the name of [Hart] as the source of the threat. The agents also very quickly had retrieved two suspects from the Department of Motor Vehicle database. Not long into the interview, the agents suspected BM1 Ramos of violating the UCMJ for his involvement with marijuana. They continued to question BM1 Ramos about the threat and the business without advising him of his rights under Article 31(b) of the UCMJ.

SA Stinson, an agent who spent a majority of his CGIS career on narcotics task forces, testified that as soon as marijuana was mentioned in the interview, it was a "red flag" and that he had "connected" in his mind that Ramos was a part of an illegal business under the UCMJ. He stated that he took notes of Ramos's incriminating references to the business as "we" and "ours" because it indicated Ramos was involved, regardless of whether his name was on the paperwork. SA Stinson also testified that he was suspicious of Ramos violating the UCMJ "during probably the last half of the Ramos interview." However, this is contrary to statements he made later where he indicated that he may have been aware the business involved marijuana even before the interview with Ramos began.

The military judge made a finding of fact that although the agents did not specifically ask Ramos about his involvement in the business, Ramos volunteered that information during the course of the interview. Those statements later became the basis for the remaining false

---

[2] As noted above, the government concedes the first, third, and fourth *Jones* factors, which include that at the time of the interview, Ramos was suspected of an offense and the elicited statements were in regard to the offenses of which he was suspected. *See Jones,* 73 M.J. at 361.

official statement charge at issue in this case. While this finding of fact is not clearly erroneous, it fails to consider the totality of SA Stinson's testimony. Although the agents avoided asking Ramos about *his involvement* in the business specifically, SA Stinson testified that he knew that asking questions about the marijuana business would "[p]otentially" elicit an incriminating response.

Additionally, we find that the military judge abused his discretion concerning his conclusion of law that the agents were not conducting a law enforcement investigation, but were instead focused on "force protection." *United States v. Solomon*, 72 M.J. 176, 180 (C.A.A.F. 2013) (holding that the military judge abused his discretion when he "altogether failed to mention or reconcile" critical facts, such as alibi evidence and prior acquittals). The military judge in this case declined to consider, or mention in his analysis, the critical testimony that the agents declined to advise Ramos of his Article 31(b) rights because, if they had, they "would have had to tell him what he was suspected of and then hoped he would have continued to talk." The agents, instead, took notes of Ramos's unwarned and incriminating statements, which later formed the basis for the false official statement charge. This testimony, when coupled with SA Stinson's earlier testimony that the agents suspected Ramos of an UCMJ violation, reflects conduct that appears intentionally designed to evade Ramos's codal rights in furtherance of a law enforcement investigation. *See Cohen*, 63 M.J. at 50. Under these circumstances, absent any exceptions to Article 31(b), Ramos was entitled to be advised of his rights as soon as the agents suspected he had committed an offense under the UCMJ.

## Exceptions to the Article 31(b) Rights Requirement

Our conclusion that Article 31(b) applied to Ramos's statements does not end our inquiry. This court has carved out a narrow exception to the Article 31(b) requirement for questions that are asked in an "administrative" or "operational context." *See United States v. Bradley*, 51 M.J. 437, 441 (C.A.A.F. 1999); *United States v. Moses*, 45 M.J. 132, 136 (C.A.A.F. 1996); *United States v. Loukas*, 29 M.J. 385, 389 (C.M.A. 1990); *United States v. Vail*, 11 C.M.A. 134, 28 C.M.R. 358 (1960). The government argues that the

situation in this case was akin to the "operational context" cases because the agents were attempting to assess and mitigate the possible threat to the base and Coast Guard personnel. In *Loukas*, we held that Article 31(b) warnings were not required when a supervisor asked a crewmember, who was hallucinating while aboard an in-flight military aircraft, whether he had taken any drugs. 29 M.J. at 389. We reasoned that the questions were not asked pursuant to an "official law-enforcement investigation" but, instead, were asked in an "operational context," as a part of the supervisor's "operational responsibilities" to ascertain the level of danger to the aircraft and the crew. *Id.* at 387-89. In *Vail*, authorities caught a servicemember stealing weapons from a military warehouse and, upon apprehension, asked him the location of the stolen weapons. 11 C.M.A. at 135-36, 28 C.M.R. at 359-60. We found Article 31(b) to be inapplicable to a situation where a law enforcement officer is "naturally and logically expected to ask the criminal to turn over the property which he has just stolen." *Id.* at 136, 28 C.M.R. at 360. In *Moses*, we held that the conversations that elicited incriminating responses between law enforcement and an accused–who had barricaded himself in a house with hostages–were not subject to Article 31(b) because they "were solely intended to end the siege and were not undertaken pursuant to a law enforcement investigation or a disciplinary inquiry." 45 M.J. at 136.

As these cases reflect, we have recognized that situations which involve an "operational context" may relieve law enforcement from giving Article 31(b) rights where immediate operational issues are implicated. The facts of this case, however, fall far below the threshold of finding the type of circumstances that would warrant application of the "operational context" exception. *See Vail*, 11 C.M.A. at 135, 28 C.M.R. at 359 ("Slight differences in the factual background may bring the case within the operation of Article 31 or effect its exclusion."). This case simply does not involve a context similar to a mid-flight disturbance, an accused caught "red-handed" stealing weapons, or an armed hostage situation. *See Moses*, 45 M.J. at 136; *Loukas*, 29 M.J. at 389; *Vail*, 11 C.M.A. at 135, 28 C.M.R. at 359.

Instead, Ramos sought the protection of CGIS from what he perceived to be a threat to himself and his wife.[3]

It is important to note that after receiving Hart's threat, Ramos waited until the next day to inform his chain of command. When the executive officer learned of the threat, he quickly notified base security, thereby securing the base. During the interview, the agents assessed that the danger was not immediate. In response to the military judge's questions as to why the agents continued to question Ramos for forty-five minutes when they were presumably facing an "immediate threat to the facility," SA Stinson testified that while it initially appeared that there was an immediate threat to the base, "it became clear that it was a threat, more specifically at BM1 and Mrs. Ramos." In fact, after interviewing Ramos, the agents did not contact base

---

[3] The dissent likens this case to *Bradley* to conclude that the agents were not acting in a law enforcement capacity and, therefore, were not required to give Ramos his Article 31(b) warnings. In *Bradley*, this court held that a commander inquiring into charges against the accused, for purposes of possibly revoking his high-level security clearance, did not require Article 31(b) warnings. 51 M.J. at 441. We noted that Bradley did not argue the case was "not within the ambit of the administrative and operational exception," but, instead, argued the commander's concern about the clearance was a "pretext" to ask incriminating questions to be used against him at court-martial. *Id.* We found that there was no evidence the commander "was pursuing a criminal investigation or held any other law enforcement role in appellant's case." *Id.* at 441-42. Accordingly, this court held that the military judge and lower court did not err in concluding the commander was not operating in a law enforcement capacity. *Id.* at 441.

The instant case is distinguishable because we hold the military judge did abuse his discretion in concluding the agents, who had extensive drug-related experience and a suspicion the accused had committed an offense, were not acting in a law enforcement capacity. Furthermore, the agents did hold a "law enforcement role" in this case. *Id.* at 441-42. We reject the notion, urged by the government and dissenting opinion, that the *Cohen* "mixed purpose" analysis requires the "primary purpose" of the questioners to be that of discipline or law enforcement. *See Cohen*, 63 M.J. at 50.

security, but merely told Ramos to call 911 if there was an emergency related to Hart's threat.

All of this runs counter to the government's argument that exigent operational circumstances justified the agents' failure to give Ramos his Article 31(b) rights. Therefore, unlike the "operational context" cases, there was no immediate operational necessity that required the agents to forgo the Article 31(b) warnings.

Having found error, we now look to prejudice. "[W]hen an Article 31(b), UCMJ, violation occurs in a particular case, the appropriate test for prejudice depends upon the facts and circumstances presented." *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016). The express language of Article 31 does not permit a false official statement offense to be based upon an erroneously unwarned statement.[4] *See Swift*, 53 M.J. at 448 ("Without [the unwarned statement], there is no proof of an offense, and the specification must be dismissed."). As Ramos's statements are the sole predicate of his Article 107 conviction, we hold that the use of his unwarned statements prejudiced his substantial rights and the specification must be dismissed. *Id.*

## CONCLUSION

Because the agents suspected Ramos of an offense based on his involvement with the marijuana business during the interview, it was the agents' duty to notify Ramos of his Article 31(b) rights before continuing to ask questions regarding that business. To hold that these circumstances presented an operational exigency serious enough to circumvent an accused's Article 31(b) rights would stretch the exception beyond its logical bounds. Accordingly, we reverse the CCA's holding as to the false official statement charge that is predicated on Ramos's statements to SA Stinson. As Ramos has not challenged his convictions on the drug-related offenses for which he was convicted, we affirm the remaining findings.

---

[4] Article 31(d) states, "No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."

## **DECISION**

The decision of the United States Coast Guard Court of Criminal Appeals is reversed as to Specification 1 of Charge II and the sentence. Specification 1 of Charge II is dismissed. The remaining findings of guilty are affirmed. The record of trial is returned to the Judge Advocate General of the Coast Guard for remand to the Court of Criminal Appeals for its determination to either reassess the sentence or to set aside the sentence and order a rehearing.

Judge STUCKY, dissenting.

In the specification at issue in this case, the prosecution alleged that Appellant made a false official statement to a member of the Coast Guard Investigative Service (CGIS): "that he was not involved in his wife's business venture related to the production of marijuana, or words to that effect." I disagree with the majority's conclusion that the CGIS agents were required to advise Appellant of his Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012), rights before questioning him about his wife's marijuana business. Therefore, I respectfully dissent.

Law enforcement agents must advise a suspect of his rights "'if the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry.'" *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014) (quoting *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000)). This is a question of law we review de novo. *Id.* In doing so, we assess "all the facts and circumstances at the time of the interview to determine whether the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity." *Id.* (internal quotation marks omitted) (citation omitted).

In this case, the CGIS agents were informed by an officer in Appellant's chain of command "that there was a credible threat against [Appellant] at home and to the base," and that "the threat is over a civil dispute between the member's wife's marijuana, recreational marijuana growing business." When Appellant told Agent Stinson that "his wife's … business partner or previous business partner had made threatening statements towards him and his wife," that the business partner, Mr. Hart, "had threatened to go to [Appellant's] command," that "Mr. Hart had anger issues, that [Appellant] believed [Mr. Hart] committed crimes in the past," and that he was "a bully."

Agent Stinson's "primary concern … was … to figure out what the threat truly was and then to mitigate that threat." He did not think he asked Appellant about his involvement in the business. "I think he told us that it was his wife's business and he was not involved." It was only his use of the

terms "we" and "ours" when talking about his wife's business that led him to believe Appellant might be a suspect.[1]

During the interview, Appellant provided the agents with contact information for Mr. Hart and was able to identify him from photos that Agent Stinson was able to obtain from a Department of Motor Vehicle database. Agent Stinson did not advise Appellant of his Article 31(b) rights because they "were not asking incriminating questions." The agents asked about the business to determine who was involved and from whom the threat was coming. Although the agents recognized the potential for their questions to elicit incriminating responses, they were focused on the threat— "to fully identify the threat and be able to find and mitigate that threat." The military judge found as a fact, that "[t]he agents asked no specific questions about [Appellant's] involvement with the marijuana grow [sic] business," and that Appellant volunteered that information. The majority concedes as much. *United States v. Ramos*, __ M.J. __, __ (7–8) (C.A.A.F. 2017).

The agents paused the interview with Appellant to discuss among themselves the way forward and to determine if they needed to advise Appellant of his Article 31(b) rights. At that time, Mr. Hart telephoned CGIS and agreed to talk to the agents. The agents terminated the interview with Appellant without asking him any further questions, but they did provide Appellant with information concerning force protection before he left the CGIS office.

In the past, this Court has recognized exceptions to the requirements of Article 31(b). *See, e.g.*, *United States v. Bradley*, 51 M.J. 437, 441 (C.A.A.F. 1999); *United States v. Moses*, 45 M.J. 132, 136 (C.A.A.F. 1996); *United States v. Loukas*, 29 M.J. 385, 389 (C.M.A. 1990). This case is similar to *Bradley*. There, a commander asked the appellant, who

---

[1] A suspect is a person whom law enforcement agents reasonably believe committed a criminal offense. *See United States v. Meeks*, 41 M.J. 150, 161 (C.M.A. 1994). "The fact that there is 'a hunch' that a crime has been committed does not trigger Article 31(b)." *Id.* This seems more like a hunch than a reasonable belief, but I recognize that the military judge's finding that Appellant was a suspect is not clearly erroneous.

had been accused of rape, whether he had been charged with an offense in order to determine whether his security clearance should be revoked. 51 M.J. at 439. When the appellant said he had not talked to law enforcement authorities, we held that although the appellant's commander "was acting in an official capacity, he was seeking information needed for the proper review of appellant's security clearance status and was not conducting a criminal investigation." *Id.* at 442. Therefore, Bradley's unwarned statement was admissible. *Id.*

Here, the case for applying the exception is more compelling. "The mission of the U.S. Coast Guard Investigative Service is to support and protect U.S. Coast Guard personnel, operations, integrity and assets worldwide. We prevent and defeat criminal threats through objective and independent investigations." United States Coast Guard, Coast Guard Investigative Service, https://www.uscg.mil/hq/cg2/cgis/ (last visited July 13, 2017). Under all of the facts and circumstances of this case, the CGIS agents were acting in a force-protection mode. They were trying to discover the extent of the business partnership to determine who, if anyone, represented a credible threat to Appellant, his wife, the Coast Guard installation, and its personnel. There is no evidence that the CGIS agents were using the questioning as a ruse to avoid advising Appellant of his Article 31(b) rights. In fact, they came to a point where they interrupted the interview to determine if it was then necessary to advise Appellant of his rights. I conclude that the military judge did not err in ruling that the CGIS interview with Appellant was not done for a law enforcement or disciplinary purpose and, therefore, Appellant's false statement was admissible.