*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES
————————

### UNITED STATES
Appellee

**v.**

### Bradley M. METZ, Corporal
United States Marine Corps, Appellant

**No. 23-0165**
Crim. App. No. 201900089

Argued February 27, 2024—Decided June 20, 2024

Military Judge: John L. Ferriter

For Appellant: *Major Colin W. Hotard*, USMC (argued).

For Appellee: *Major Candace G. White*, USMC (argued); *Colonel Joseph M. Jennings*, USMC, *Lieutenant Colonel James A. Burkart*, USMC, and *Brian K. Keller*, Esq. (on brief).

Judge SPARKS delivered the opinion of the Court, in which Judge MAGGS, Judge HARDY, and Judge JOHNSON joined. Chief Judge OHLSON filed a separate dissenting opinion.

————————

Judge SPARKS delivered the opinion of the Court.

Corporal (E-4) Bradley M. Metz (Appellant) was convicted by members, contrary to his pleas, of one specification of arson, one specification of housebreaking, and one specification of unlawful entry in violation of Articles 126, 130, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 926, 930, 934 (2012 & Supp IV 2013-2017).[1] He was sentenced to a bad-conduct discharge, one year of confinement, forfeiture of all pay and allowances, and reduction to grade E-1. The United States Navy-Marine Corps Court of Criminal Appeals (CCA) approved the findings and sentence. *Metz,* 2023 CCA LEXIS 117, at *47, 2023 WL 2336107 at *16.

This Court granted Appellant's initial petition on appeal and, in a summary disposition, set aside the CCA's decision. *United States v. Metz*, 82 M.J. 45 (C.A.A.F. 2021). We remanded the case to the lower court, instructing them to "conduct the three-pronged approach of *Brown v. Illinois*, 422 U.S. 590 (1975), in examining the effects of an unlawful apprehension upon a subsequent search." *Id*. We also instructed the lower court to order affidavits or a factfinding hearing, if necessary. *Id.* at 46. Without conducting any further factfinding, the lower court reconsidered the case in light of this Court's guidance and again approved the findings and sentence. *Metz,* 2023 CCA LEXIS 117, at *47, 2023 WL 2336107, at *16.

Appellant now asks this Court to decide two questions. First, was Appellant a suspect when first interviewed by Naval Criminal Investigative Service (NCIS) agents, triggering a requirement for Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012), warnings? Second, did the lower court err

---

[1] The military judge conditionally dismissed, to ripen into prejudice upon completion of appellate review, the Article 134, UCMJ, charge and its sole specification, as an unreasonable multiplication of charges with the Article 130, UCMJ, charge and its sole specification. *United States v. Metz,* No. 201900089, 2023 CCA LEXIS 117, at *1 n.1, 2023 WL 2336107, at *1 n.1 (N-M. Ct. Crim. App. Mar. 3, 2023) (unpublished).

in its application of *Brown* and its subsequent finding that trial defense counsel was not ineffective when he failed to move to suppress evidence derived after an illegal apprehension?[2] For the reasons outlined below, we answer both questions in the negative and affirm the CCA's decision.

## I. Background

Early in the morning of Sunday, May 20, 2018, a fire broke out at a facilities maintenance building at Camp Pendleton in California. When firefighters arrived, they found no signs of forced entry and suspected the fire had been intentionally set. They informed the NCIS, who opened an investigation. NCIS agents CP and KT interviewed the noncommissioned officer (NCO) in charge of the building, Staff Sergeant (SSgt) JS. He told the investigators that Appellant and another Marine both had keys to the facility but he could not definitively say who else might have had keys and indicated the keys could be passed around. SSgt JS also had keys to the facility. Agent CP asked SSgt JS about a helmet and logbook that appeared to have been intentionally burned and he indicated they belonged to a sergeant who had recently counseled Appellant. SSgt JS referred to Appellant as a "problem child" and Agent KT noted that he said Appellant "has [a] bad grudge." He told agents that "if anyone was going to start the fire it would have been [Appellant]." SSgt JS's interest in the fire raised suspicions about his possible involvement, and he was later brought in for an interview as a potential suspect.

---

[2] The Court granted review on the following issues:

> I. Was Appellant a suspect, triggering Article 31(b), UCMJ[,] warnings?
>
> II. Despite finding Appellant was illegally apprehended, did the lower court erroneously apply *Brown v. Illinois*, 422 U.S. 590 (1975), and find the trial defense counsel's admitted failure to move to suppress evidence derived after the apprehension was not ineffective?

The agents went to the barracks that housed several persons who held keys to the maintenance building. They knocked first on a door that was ajar without knowing that Appellant occupied the room. The agents told Appellant they were investigating an incident at his workplace and asked if they could come inside to speak with him. Appellant agreed to talk and invited them in. The agents did not deliver Article 31(b), UCMJ, warnings. Appellant told the agents he did not know anything about the incident at the maintenance building and had not left the barracks area that morning. He said he had lent his key to someone, indicating that it could be lost, and that he had reported the missing key to his command.

As Agent CP was scanning the room to ensure no one else was present, he noticed some shoes inside the bathroom that appeared to be wet, as if they had been laid out to dry. They were hanging on towel hooks and the insoles were nearby, propped on the toilet paper holder. Agent CP asked Appellant, "Hey are those Nikes?" Appellant said yes. Agent CP then asked, "Do you mind if I go and take a look at them?" and Appellant replied that he could.

Agent CP testified that he entered the bathroom and, as he got closer to the shoes, he detected an overwhelming odor of gasoline, possibly jet fuel or diesel. Agent CP and Agent KT immediately ended their interview with Appellant and left his room. The agents returned to their vehicle and remained outside the barracks hoping to spot Appellant if he attempted to dispose of the shoes. They returned to Appellant's room after approximately twenty minutes and noted that he had moved the shoes to the ledge of the door, presumably to continue drying. Appellant was not in his room. Agent CP testified that they were worried they might have "spooked" him and that "something bad" might be happening. He went to look for Appellant and found him coming out of a breezeway near the smoke pit.

The exact order of the events that followed is unclear. Agent CP testified that he asked Appellant to remove his hands from his pockets. Appellant was slow to comply. He hesitated "[l]ong enough for [Agent CP] to feel

uncomfortable" and Agent CP "just didn't like his behavior at that point." Agent CP said that he told Appellant, "'Hey, you're making me real nervous right now, and we want to talk to you some more.'" He frisked and handcuffed Appellant. Agent CP and Appellant disagree about whether the frisking happened before or after the handcuffing. Agent CP "asked [Appellant] if he'd be willing to come up and talk to us back at the room, at which time, we went back up to the room and he was released. I explained to him why I did that and we went from there."

Agent CP and Appellant, still handcuffed, returned to his room where Agent KT was waiting. Agent CP testified that the walk took a minute at most. The agents did not give Appellant an Article 31(b), UCMJ, warning. Agent CP removed the handcuffs either just before or just after Agent KT asked Appellant for consent to search his room. Appellant gave his consent. He read and signed a Permissive Authorization for Search and Seizure (PASS) form that stated the agents were investigating arson. The PASS required Appellant to initial in eight different places, sign, and date, and informed him that he had the right to refuse the search of his room. The lower court characterized the apprehension as "brief and without incident." *Metz,* 2023 CCA LEXIS 117, at *43, 2023 WL 2336107, at *15.

The lower court described the search and subsequent interview:

> While in the room, the special agents did not ask Appellant any questions about the fire, but they did seize several items. Among them were the wet shoes and insoles that smelled of gasoline; a pair of black pants, a charcoal grey t-shirt, a white t-shirt, and a pair of boxer shorts, which were all inside a laundry bag; a blue lighter; and a silver key (that turned out not to be the facilities maintenance building key) found in Appellants dresser drawer. The shoes and clothes were specially packaged for forensic testing.

> The agents then drove Appellant to the NCIS office for an interview. Along the way, they discussed mostly food, but based on the later video of

the interrogation it appears there was also some
discussion about Appellant's dissatisfaction with
the Marine Corps. When they arrived at the NCIS
office, Appellant read and signed an Article 31(b)
rights advisement warning.

*Id.* at *7-8, 2023 WL 2336107, at *3. They placed Appellant
in handcuffs during the thirty-minute drive to the NCIS
office and removed them when they arrived.

The next day, Appellant signed another PASS and
NCIS agents conducted a second search of his room. They
found the key to the maintenance building hidden inside a
tissue box. They also seized a pair of black gloves that
smelled like fuel.

## Trial

In a pretrial motion, defense counsel asked the military
judge to suppress every statement made by Appellant to
NCIS and all derivative statements and evidence because
Appellant was a suspect when they interviewed him at his
barracks room and should have been given Article 31(b),
UCMJ, warnings. The military judge denied the motion.
He ruled that the agents "did not believe and should not
have reasonably believed that [Appellant] committed an of-
fense" when they interviewed him in his room. The inves-
tigation was still "in its infancy" and contacting Appellant
was "a logical early step." He also stated that the agents
did not discover any evidence directly as a result of Appel-
lant's statements during that interview. In addition, he de-
termined that Appellant's voluntary consent to search his
room would have attenuated the seizure of anything from
the room. Appellant was convicted by members of all
charges.

## United States Navy-Marine Corps Court
of Criminal Appeals

In its initial opinion, the CCA affirmed the findings and
sentence. *United States v. Metz*, No. 201900089, 2020 CCA
LEXIS 334 at *43, 2020 WL 5652868 at *15 (N-M. Ct. Crim.
App. September 23, 2020) (unpublished). On remand, the
lower court again affirmed. *Metz,* 2023 CCA LEXIS 117, at
*47, 2023 WL 2336107, at *16. It found that law

enforcement did not view Appellant as a suspect in their initial interview and that there was no evidence they reasonably should have viewed him as a suspect. *Id.* at *24-25, 2023 WL 2336107, at *8. It examined this Court's holdings in *United States v. Muirhead*, 51 M.J. 94 (C.A.A.F. 1999), and *United States v. Davis*, 36 M.J. 337 (C.A.A.F. 1993), and determined that Appellant remained merely a person of interest until Agent CP encountered the wet shoes smelling like fuel, at which point the agents terminated the interview and left. *Id.* at *19-23, 2023 WL 2336107, at *7-8. Therefore, the agents did not improperly fail to provide Appellant with his Article 31(b), UCMJ, rights.

The lower court also found that defense counsel was not ineffective in failing to move to suppress evidence derivative of an unlawful apprehension. *Id.* at *44, 2023 WL 2336107, at *15. It determined that Agent CP's extended holding of Appellant was unlawful and, under this Court's instruction, assessed the impact of the illegal apprehension using the *Brown* factors. *Id.* at *38, 2023 WL 2336107, at *13. As an initial matter, it found that Appellant's consent was voluntary with no evidence of coercion or that Appellant did not understand his right to refuse consent. *Id.* at *39-40, 2023 WL 2336107, at *13. Moving on to the *Brown* factors and whether Appellant's consent was an act of independent free will, it concluded that Appellant's consent to search was in close temporal proximity to his illegal apprehension. *Id.* at *41, 2023 WL 2336107, at *14. However, signing the PASS form qualified as an intervening circumstance that could purge the taint. *Id.* at *42, 2023 WL 2336107, at *14. In addition, there was no indication Appellant's brief detention was for improper purposes or manifested any flagrant form of misconduct. *Id.* at *44, 2023 WL 2336107, at *15. Therefore, the *Brown* factors favored the Government, any motion to suppress would have been unsuccessful, and defense counsel was not ineffective in failing to raise such a motion.

7

## II. Discussion

### Article 31(b), UCMJ, Rights

Article 31(b), UCMJ, states that:

> No person subject to this chapter may interrogate, or request any statement from, an accused or person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Such warnings are required when "(1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014) (citing *United States v. Cohen*, 63 M.J. 45, 49 (C.A.A.F. 2006)). "Whether a person is a suspect is an objective question that is answered by considering all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the servicemember committed an offense." *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000) (internal quotation marks omitted) (quoting *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991)). At times it can also be appropriate to consider the subjective view, looking at "what the investigator, in fact, believed, and . . . decid[ing] if the investigator considered the interrogated person to be a suspect." *Muirhead*, 51 M.J. at 96. Designating someone a suspect for Article 31(b), UCMJ, purposes requires more than merely a "hunch." *Swift*, 53 M.J. at 447.

We review a military judge's ruling on a motion to suppress for an abuse of discretion. *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995). "[A] military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *Id.* "When there is a motion to suppress a statement on the ground that rights'

warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law de novo." *United States v. Ramos*, 76 M.J. 372, 375 (C.A.A.F. 2017) (internal quotation marks omitted) (quoting *Swift*, 53 M.J. at 446).

Appellant argues that both the military judge and the lower court improperly determined that he was not a suspect when he was first questioned by investigators. However, the military judge's finding of fact that law enforcement did not believe Appellant was a suspect on their initial visit to his barracks room is not clearly erroneous, and we agree that the facts and circumstances do not indicate that law enforcement believed or reasonably should have believed Appellant was a suspect. Appellant did possess a key to the facilities maintenance building, but the agents were informed that multiple people had keys to the facility and that those keys were known to be passed around. SSgt JS told investigators that Appellant could be troublesome and a "problem child" with a grudge. However, it is a long leap from having an attitude to burning down the building. There was no indication Appellant had threatened to damage the building or do any sort of violence. In addition, all the negative character information Agent CP and Agent KT received about Appellant came from a single source, SSgt JS, who was still under suspicion himself. Agent KT stated in her testimony at the suppression hearing that, "[o]ther people don't run our investigations, and just because someone may have a problem with Corporal Metz does not mean that we do." Appellant invited the agents into his room and was cooperative while talking to them, giving them no added reason to suspect him of the offense. Subjectively, both agents testified that they did not consider Appellant a suspect at the time and were merely conducting screening interviews.[3] It was only

---

[3] Both Agent CP and Agent KT testified that they thought they needed probable cause to consider Appellant a suspect, not the proper standard of reasonable suspicion. Though it is troubling that both agents were not aware of the correct standard for determining whether someone is a suspect, even under the

when Agent CP detected that gasoline odor coming directly from the shoes that the balance shifted, at which point the agents ended the interaction and departed.

Appellant also argues that Agent CP's questions about his shoes should have triggered Article 31(b), UCMJ. However, looking at the facts and circumstances, just the drying shoes themselves would not be enough to make Appellant a suspect. Shoes could be hanging up to dry for many innocent reasons from rain to mud to washing your car. Appellant did not show any concern about the shoes and immediately agreed that Agent CP could look at them. It was not until Agent CP got close enough to smell the gasoline coming from the shoes that he became suspicious. At that point, agents ceased their questions and left the room.[4]

It is helpful to compare the circumstances in this case to this Court's decision in *Davis*. In *Davis*, the victim was found dead behind the base commissary after a night of playing pool and the wounds were consistent with wounds inflicted with a pool cue. 36 M.J. at 338. The appellant had been at the pool hall that night. *Id*. He had previously voiced a desire to shoot a police officer and was undergoing mental health evaluation. *Id*. He had also been overheard making comments about the murder victim being "jabbed with a pool stick," though this was not common knowledge. *Id*. at 339 (internal quotation marks omitted). When the appellant was initially interviewed, he was not provided with his Article 31(b), UCMJ, rights. *Id*. This Court concluded that the appellant was not a suspect at the time of

---

proper reasonable suspicion standard Appellant was not yet a suspect at the time of the initial interview.

[4] In his investigation report, Agent CP stated that he smelled a faint odor of fuel prior to asking to see the shoes and the military judge included this in his findings of fact. However, Agent CP testified at trial that he did not smell gasoline until he got into the bathroom. Defense counsel cross-examined Agent CP about this inconsistency and he testified that the investigation report was incorrect. In light of that testimony, the lower court's finding that Agent CP did not smell fuel until he approached the shoes was not clearly erroneous.

the initial questioning because he was one of several patrons who had their own pool cues and his comments and mental health status were not directly related to the incident being investigated. *Id.* at 340-41.

As in *Davis*, when Appellant was initially interviewed he was one of multiple people who possessed keys to the building and had potential knowledge of the crime. His behavioral problems were general in nature, with no threats to commit arson or anything else that would directly tie him to the incident. *See also United States v. Miller*, 48 M.J. 49, 54 (C.A.A.F. 1998) (finding that "[b]ased on the evidence available to [law enforcement] the investigation had not sufficiently narrowed to make appellant a suspect" and therefore Article 31(b), UCMJ, warnings were not required).

Nothing that occurred before and during the initial interview with Appellant made him a suspect for Article 31(b), UCMJ, purposes. The objective facts and circumstances support the agents' testimony that they were conducting screening interviews. Therefore, the military judge did not abuse his discretion when he concluded a rights warning was not required.

## Ineffectiveness of Counsel

The Supreme Court has distinguished two components essential for establishing ineffectiveness of counsel. First, an appellant must show that counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, an appellant must show that counsel's deficient performance resulted in prejudice. *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* An appellant must prove that defense counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's

assistance was reasonable considering all the circumstances." *Id.* Scrutiny of counsel's performance should be highly deferential. *Id.* at 689. The court must assess "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

We have consistently held that "[w]hen a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion to suppress evidence, an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. Jameson*, 65 M.J. 160, 163-64 (C.A.A.F. 2007) (alteration in original) (internal quotation marks omitted) (citation omitted); *United States v. McConnell,* 55 M.J. 479, 482 (C.A.A.F. 2001); *United States v. Napoleon,* 46 M.J. 279, 284 (C.A.A.F. 1997). Similarly, if deficient performance is established, to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus:

> Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.

*Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Finally, "[i]n reviewing for ineffectiveness, th[is] Court looks at questions of deficient performance and prejudice de novo." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (internal quotation marks omitted) (quoting *United States v. Gutierrez*, 66 M.J. 329, 330-31 (C.A.A.F. 2008)).

Appellant claims that his defense counsel was ineffective in failing to make a motion to suppress evidence derived from his illegal apprehension. In an affidavit

provided to the lower court, defense counsel stated that "there was no strategic purpose in avoiding citation to the 'Fourth Amendment issue' other than having not considered it as a valid basis to rely upon." However, even if there was no strategic purpose in failing to raise the issue, such a motion to suppress would not have been meritorious and therefore there was no ineffective assistance.

Appellant argues that the lower court improperly applied the *Brown* factors in assessing the impact of his illegal apprehension by placing too much emphasis on the voluntariness of Appellant's consent. We disagree. The lower court did discuss voluntariness but also examined each of the three *Brown* factors, concluding correctly that analysis of those factors indicated any motion to suppress based on the illegal apprehension was without a reasonable probability of success. *Metz,* 2023 CCA LEXIS 117, at *44, 2023 WL 2336107, at *15.

We concur with the lower court's finding that there was an illegal apprehension. In *Terry v. Ohio*, the Supreme Court established that law enforcement may conduct a limited search of a person when there is reasonable fear for their own or others' safety without violating the Fourth Amendment. 392 U.S. 1, 30-31 (1968). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experiences." *Id.* at 27. Here, even if Agent CP's initial suspicions about Appellant keeping his hands in his pockets allowed for a *Terry* stop, he kept Appellant handcuffed beyond the time necessary to establish he was not armed and presented no physical danger. There is no indication of any "specific reasonable inferences" that suggested Appellant should have been handcuffed while he was led up to his room.

Given that an illegal apprehension did occur, we then consider whether a motion by defense counsel to suppress evidence based on this apprehension would have been meritorious and whether there is a reasonable probability that

the verdict would have been different absent any excludable evidence. Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (internal quotation marks omitted) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)). "The critical inquiry is whether appellant's consent to search was sufficiently an act of free will to purge the primary taint of the unlawful [act]." *United States v Khamsouk*, 57 M.J. 282, 290 (C.A.A.F. 2002) (internal quotation marks omitted) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). We look at whether the objected-to evidence was obtained by exploitation of the initial illegality or in a manner that is sufficiently distinguishable as to cleanse it of the primary taint. *Id.* "Whether consent to a search is valid is measured by whether the consent was freely and voluntarily given as determined by the totality of the circumstances." *United States v Frazier*, 34 M.J. 135, 137 (C.A.A.F. 1992) (internal quotation marks omitted) (citations omitted).

In *Khamsouk*, this Court favored adopting the factors laid out in *Brown* "to address issues of attenuation in the context of consent." 57 M.J. at 291. As later articulated in *United States v Conklin*, *Brown* concluded that:

> To determine whether the defendant's consent was an independent act of free will, breaking the causal chain between the consent and the constitutional violation, we must consider three factors: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct.

63 M.J. 333, 338-39 (C.A.A.F. 2006) (internal quotation marks omitted) (quoting *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002)). The burden of proving

admissibility lies with the prosecution. *Brown*, 422 U.S. at 604.

Here, the first *Brown* factor favors Appellant. The illegal apprehension took place within minutes of the request for consent to search his room. There was no meaningful temporal break at all. The second *Brown* factor is a closer call. The primary intervening circumstance between the illegal apprehension and the search was uncuffing Appellant to sign the PASS. Though it is certainly good that agents followed proper procedure in having Appellant sign the single-page PASS document, this advisement of his rights is not significant enough on its own to purge any taint. *See Khamsouk*, 57 M.J. at 292 (concluding that the administration of Article 31(b), UCMJ, rights and a signed acknowledgment of the right to refuse consent "is not dispositive of the issue of whether appellant's consent is sufficiently attenuated from the taint of the unlawful entry"). However, though the order of events is disputed and somewhat unclear, at some point after the illegal apprehension Agent CP also explained to Appellant that he had been handcuffed for officer safety reasons and Agents CP and KT informed Appellant that they wanted to search his room because they were looking into arson. In addition, we see no direct causal connection linking the illegal apprehension to the consent to search. The agents' desire to search Appellant's room was not a direct result of the illegal apprehension. Rather, it stemmed from the earlier and entirely proper interview in Appellant's room. In contrast, in *Conklin* this Court determined the second factor favored the appellant in part because there was a causal connection between the illegal action (an earlier illegal search of the appellant's computer) and the request for consent to search his room. 63 M.J. at 338-39.

The third *Brown* factor favors exclusion "only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 579 U.S. at 241. "The Supreme Court has identified this third factor as particularly important, presumably because it comes closest to satisfying the deterrence rationale for applying the

exclusionary rule. In fact, given the exclusionary rule's purpose of deterring police misconduct, the factor may be the most important factor." *Khamsouk*, 57 M.J. at 291 (internal quotation marks omitted) (citations omitted). Assessing the third *Brown* factor involves determining whether the law enforcement conduct is the sort that the exclusionary rule was intended to deter. *Id.* at 293. This Court has determined that law enforcement behavior need not be outrageous or display bad motive or intent for the third *Brown* factor to apply. *United States v. Darnall*, 76 M.J. 326, 331 (C.A.A.F. 2017). In *Conklin*, we decided that it was sufficient that law enforcement's actions were "unwise, avoidable, and unlawful" and that agents subsequently exploited the original illegality. 63 M.J. at 339.

The third *Brown* factor is dispositive here. Appellant was illegally held for a few minutes at the most, as he walked from the breezeway near the smoke pit to his room. Agent CP's testimony and actions indicate that the illegal apprehension stemmed from overall nervousness and uncertainty about Appellant's state of mind. Agent CP testified that, because Appellant was slow to remove his hands from his pockets, he became nervous, placed Appellant in handcuffs, and frisked him for weapons. There is no evidence that the agents had concocted a plan to further their investigation by pressuring Appellant to make admissions or consent to a search of his room. Appellant's assertion that this was the purpose behind the illegal apprehension is purely speculative. The agents did not know that Appellant would not be in his room when they returned. *See Brown*, 422 U.S. at 605 (finding, in contrast, no attenuation when the actions of law enforcement "had a quality of purposefulness" and the detectives "repeatedly acknowledged, in their testimony, that the purpose of their actions was 'for investigation' or for 'questioning' " indicating an "expedition for evidence in the hope that something might turn up").

Nothing in Agent CP's behavior or testimony indicates the level of flagrancy or purpose and intent needed to trigger the exclusionary rule. In a declaration attached to the

record on appeal, Appellant claimed that he was still hand-cuffed when the agents asked to search his room, but even if this was the case, he was uncuffed a moment later to sign the PASS. In addition, the agents' decision to provide the written PASS form indicates good faith and an attempt to follow proper procedure. *See Khamsouk*, 57 M.J. at 292 (stating that the fact that agents "provided the [written consent] form with its warning mitigates against a conclusion that the police engaged in flagrant or purposeful conduct to exploit the illegal entry"). This Court in *Khamsouk* also determined that law enforcement's concerns about officer safety, even if not rising to the level of "exigent circumstances," provided further evidence that their conduct was not flagrant for the purpose of evaluating the third *Brown* factor. *Id.* at 293. A similar logic would follow here. All these considerations indicate that any misconduct on the part of law enforcement was minor, that there was no intent or attempt to exploit the illegal apprehension, and that it is simply not the kind of behavior the exclusionary rule was designed to prevent.

Application of the *Brown* factors convinces us that Appellant's consent to search was sufficiently attenuated from his illegal apprehension. We, therefore, conclude that Appellant has not carried his burden to show that there was a reasonable probability any motion to suppress evidence due to the illegal apprehension would have succeeded.

### III. Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

Chief Judge OHLSON, dissenting.

The key question arising in the instant case is whether "a reasonable person" would have considered Appellant to be "a suspect" at the time military law enforcement officials questioned him about the crime they were investigating. *United States v. Meeks*, 41 M.J. 150, 161 (C.M.A. 1994). If so, Appellant was entitled to be informed of his rights under Article 31(b), Uniform Code of Military Justice (UCMJ).[1] In deciding this issue, it is essential to note that a "*mere suspicion . . .* triggers the *obligation* to inform [a] suspect of his Article 31" rights. *United States v. Schneider*, 14 M.J. 189, 193-94 (C.M.A. 1982) (emphasis added). Moreover, only a "relatively *low* quantum of evidence" is necessary in order for the rights advisement requirement to be triggered. *United States v. Swift*, 53 M.J. 439, 447 (C.A.A.F. 2000) (emphasis added).

In my view, the following facts are determinative of the issue before us:

- A fire broke out inside a facilities maintenance building at Camp Pendleton. The Naval Criminal Investigative Service (NCIS) agents assigned to the case suspected arson and concluded that because there was no sign of forced entry, whoever started the fire inside the building had a key. The NCIS agents were told that Appellant was one of only a relatively small number of people who possessed such a key.

- The agents were told that Appellant had "a grudge" against the shop and had been recently counseled by his command.

- The agents learned that the logbook and personal hard hat of Appellant's sergeant had been placed on top of a stack of lumber that was set on fire in the building.

- The agents knew that Appellant was considered "a problem child" by others in his unit.

---

[1] 10 U.S.C. § 831(b) (2012).

- The agents were told by Appellant's sergeant that "if anyone was likely to have started the fire in the building, it would have been [Appellant]."

Thus, at the time they began questioning Appellant, the NCIS agents knew that Appellant had been identified by his sergeant as the likely culprit, and they knew that Appellant had the means, the motive, and the seeming proclivity to commit an act of this nature. Under these circumstances, and in accordance with our precedent pertaining to this area of the law, it is evident to me that at the time the NCIS agents questioned Appellant a "reasonable person" would have concluded that Appellant was "a suspect."[2] As a consequence, the NCIS agents were required to give Appellant an Article 31(b) warning before questioning him about the arson. *See United States v. Harpole*, 77 M.J. 231, 236 (C.A.A.F. 2018) (requiring Article 31(b) warnings when, in relevant part, a servicemember is suspected of an offense and a person subject to the UCMJ questions the servicemember about this offense). Their failure to do so rendered Appellant's statements involuntary and therefore inadmissible at trial. Military Rule of Evidence (M.R.E.) 304(a) (2016 ed.); M.R.E. 305(a) (2016 ed.); *see also* Article

---

[2] The majority is properly "troubl[ed]" that the NCIS "agents were not aware of the correct standard for determining whether someone is a suspect" for Article 31 purposes. *United States v. Metz*, __ M.J. __, __ (9 n.3) (C.A.A.F. 2024); *see also* Oral Argument at 27:49-27:58, *United States v. Metz* (C.A.A.F. Feb. 27, 2024) (No. 23-0165) (The Government conceded at oral argument that "at one point in the record [the agents] were not" using the correct legal standard for determining whether an individual was a suspect.). Unlike the majority, however, I cannot wave away the agents' misunderstanding of the law. As discussed above, Appellant *was* a suspect under the *proper* standard—*if* the agents had applied it. Additionally, I note that the agents' statements during their interrogation of Appellant— the agents acknowledged that they went to Appellant's room because he was "our guy," and they pointed out that there was a reason they "showed up" at Appellant's door—undermine their claim that they did not view Appellant as a suspect, despite the Government's attempt to dismiss these statements as merely being part of an interrogation technique.

31(d), UCMJ. Because the majority holds to the contrary, I respectfully dissent.[3]

---

[3] Although it is not necessary for the majority to reach this issue, I further conclude that evidence derived from Appellant's unwarned statements to the NCIS agents was inadmissible. This evidence included: Appellant giving alibi evidence that could be contradicted; Appellant lying about not having a key to the burned building; NCIS spotting Appellant's incriminating shoes that smelled like accelerant and then questioning Appellant about the shoes, causing him to implicitly acknowledge that the shoes belonged to him; NCIS locking Appellant into his story by asking him such questions as where he had been the night before and then leveraging his answers against him; and, during Appellant's subsequent consensual interrogation, NCIS repeatedly referencing Appellant's earlier unwarned statements to elicit additional damning information from Appellant. Some examples of NCIS referring to Appellant's earlier statements are as follows: "So I know last night you said that you went and hung out with a friend"; "And even when we came to your room, you were like yeah, I'm kind of a fuckup Marine"; "You even told us that you were [disgruntled about your job]"; "You even told us [that] you want to make money"; and "I asked you earlier and you said you hadn't" reported the keys missing. Moreover, the Government exploited Appellant's unwarned statements and derivative evidence at trial, referencing Appellant's false alibi and Appellant's false claim that he did not possess a key to the burned building. In addition, Appellant's unwarned statements, and evidence derived from these statements, harmed Appellant's case by prompting the military judge to give a "[f]alse exculpatory statement" instruction at trial. Because the evidence from the unwarned statements so pervasively infected NCIS's later investigatory steps as well the Government's presentation to the panel members, there is no reliable means of assessing the strength of the Government's case absent the unwarned statements. Therefore, in my view the Government has not met its burden of demonstrating that the result of the trial would have been the same if the NCIS agents had correctly advised Appellant of his Article 31(b) rights and Appellant had invoked his right to remain silent. Accordingly, I conclude that the decision of the lower court should be reversed. *See United States v. Frost*, 79 M.J. 104, 111-12 (C.A.A.F. 2019) (reversing where the government failed to meet its burden of demonstrating that improperly admitted evidence did not have a substantial influence on the findings). Given my conclusion that the proper

---

resolution of Issue I results in reversible error, I need not reach
Issue II.